[No. 50757–1.    En Banc.    December 20, 1984.]

MARVIN D. HALL, ET AL, *Appellants*, v. ARMSTRONG
CORK, INC., ET AL, *Defendants*, PITTSBURGH
CORNING CORPORATION, *Respondent*.

*Bangs, Castle, Schnautz & Hilfer, Mark Leemon, Rich-
ard J. Hilfer,* and *Stephen P. Schnautz,* for appellants.

*Garvey, Schubert, Adams & Barer,* by *John R. Allison,*
for respondent.

· The following opinion was prepared by Justice Hugh J. Rosellini prior to his death. It is adopted by the undersigned Justices as the opinion of the court.

Appellants present a products liability claim raising a question of corporate successor liability. We reject the application of the product line rule of successor liability to the facts of this case and affirm the trial court's order of summary judgment.

This case is one of several hundred filed in King County Superior Court against these defendants for damages arising out of exposure to asbestos–containing products. Many issues pertaining to all of the asbestos cases have been argued on a consolidated basis. The question of successor liability presented here was raised in this fashion. Specifically, did Pittsburgh Corning Corporation become liable as a successor corporation for claims incurred by its predecessor, UNARCO Industries, Inc. (UNARCO), when it purchased the Unibestos pipe insulation product line from UNARCO?

This question was determined on the merits by the trial judge in Russell v. Revere, King County cause 83-2-06734-1 (June 20, 1983). The trial judge held the product line rule of successor liability to be the law in Washington but nonetheless found it inapplicable to Pittsburgh Corning's acquisition of the Unibestos product line from UNARCO. Following the decision in Russell, Pittsburgh Corning obtained an order granting summary judgment in the present case.

Appellants, as plaintiffs in the trial court, filed an action for personal injuries against several present or former manufacturers of asbestos–containing insulation products. The Halls' claims arose from Marvin Hall's exposure to asbestos–containing products manufactured by the defendants named in the plaintiffs' complaint as well as products manufactured by Johns–Manville. Marvin Hall was exposed to asbestos–containing products both during his service in the United States Navy from July 1942 through October 1945, and through his employment at the Puget Sound Naval

Shipyard in Bremerton from January 1946 through May 1962. Unibestos pipe insulation was one of these products.

UNARCO began the manufacture of asbestos products in the early 1920's. One of the products, Unibestos pipe insulation, was manufactured and distributed by UNARCO from approximately 1936 until July 2, 1962. On the latter date, Pittsburgh Corning purchased the entire Unibestos product line from UNARCO. Pittsburgh Corning acquired all assets related to Unibestos, including all real estate and fixtures relating to UNARCO plants located in Tyler, Texas, and Bloomington, Illinois, which were used for the manufacture of Unibestos; all equipment and machinery located at these plants for the production of Unibestos; inventories of Unibestos located at these plants which had not yet been sold by UNARCO; business records relating to sale and distribution of Unibestos, along with all contracts, leases, licenses, patents and patent applications relating to Unibestos.

The acquisition was so complete, plaintiffs contend, that in addition to the above, Pittsburgh Corning acquired the goodwill of UNARCO relating to Unibestos as well as all trademarks and trade names concerning the product line.

The purchase agreement did not involve the transfer of any stock between the companies, nor were there any common directors, officers, or shareholders between the companies.

The purchase agreement expressly recognized that UNARCO was only selling its Unibestos product line and that the two corporations would continue to operate separately and distinctly.[1]

---

[1] Paragraph 1 of Article VIII of the sales agreement between Pittsburgh Corning Corporation and UNARCO provides:

"1. Union agrees that, for a period of not more than five (5) years after the closing date, it will not engage in the United States in the production and/or sale of any high temperature insulation product containing asbestos with which it will compete with PC in respect of PC's H–T product business, nor will it invest in any organization which is in such business. PC recognizes that, apart from the H–T product business, Union offers the following lines of insulating and packing products, containing asbestos, which Union sells: Insubestos felt; Insutape;

The purchase agreement further provided that UNARCO retained responsibility to its customers for damages caused by, or arising out of, the manufacture and sale of its Unibestos products. The agreement provided that UNARCO would indemnify Pittsburgh Corning for any claims against Pittsburgh Corning regarding UNARCO's manufacture and sale of Unibestos products.

Pittsburgh Corning manufactured and used Unibestos products during the years 1962 to 1972. UNARCO continued to manufacture a variety of other asbestos–containing products until 1970. UNARCO remains in business to this date despite its July 1982 petition for reorganization under chapter 11 of the Bankruptcy Reform Act.

The respondent, Pittsburgh Corning Corporation, was named as one of the defendants in the Halls' complaint, even though it had not begun to manufacture Unibestos until after the termination of Marvin Hall's exposure. The appellants concede that Marvin Hall was not exposed to any asbestos–containing product manufactured or sold by Pittsburgh Corning, although he was exposed to Unibestos manufactured and sold by UNARCO.

Appellants nevertheless claim that Pittsburgh Corning should be held liable under theories of successor liability for exposure to Unibestos manufactured by UNARCO.

The general rule in Washington is that a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation, except where: (1)

Wovenstone; Insutube; Type H insulation; Type SF insulation; asbestos cloth and textiles; asbestos tape; asbestos tubing; asbestos wick and rope; asbestos yarn; asbestos packing; and Unarcoboard. For purposes of this paragraph, PC acknowledges that the continuation by Union of sales of products of these lines in the sizes, shapes, and densities in which Union now offers same for sale according to its most recent UNARCO general sales catalogue does not and will not constitute competition with PC in respect of its H–T product business. Such acknowledgment shall not be construed to limit Union's right to vary the sizes, shapes and densities of its above–mentioned products in any way, subject only to the limitation contained in the first sentence of this paragraph 1." 1 Supplemental Clerk's Papers, at 36–37.

the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability. *Martin v. Abbott Labs.,* 102 Wn.2d 581, 609, 689 P.2d 368 (1984); *Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 405, 645 P.2d 689 (1982); *Cashar v. Redford,* 28 Wn. App. 394, 396, 624 P.2d 194 (1981). The basis of this traditional corporate law doctrine is that a sale of corporate assets transfers an interest separable from the corporate entity and does not result in a transfer of unbargained–for liabilities from the seller to the purchaser. Rather, the purchasing corporation receives the protection traditionally accorded any purchaser of property: the bona fide purchaser who gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims. *See* Note, *Postdissolution Product Claims and the Emerging Rule of Successor Liability,* 64 Va. L. Rev. 861, 864–65 (1978); Note, *Assumption of Products Liability in Corporate Acquisitions,* 55 B.U. L. Rev. 86, 93 (1975). The four exceptions to the traditional rule were developed to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions. *Abbott Labs.,* at 609.

In *Abbott Labs.,* we determined that the policies underlying strict liability in tort necessitated the formation of an additional exception or rule to address the particular circumstances of a products liability claimant. Rather than expanding the mere continuation exception founded on corporate law principles, we adopted the "product line rule" of liability as developed by the California Supreme Court in *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977). *Abbott Labs.,* at 610–14.

Application of the product line rule requires the court

(1) to determine whether the transferee has acquired substantially all the transferor's assets, leaving no more than a mere corporate shell; (2) to determine whether the

transferee is holding itself out to the general public as a continuation of the transferor by producing the same product line under a similar name; and (3) to determine whether the transferee is benefiting from the goodwill of the transferor.

*Abbott Labs.,* at 614.

The first element, requiring acquisition of all or substantially all of the manufacturing assets of the selling corporation, has not been met. The purchase agreement specifically provides for Pittsburgh Corning to acknowledge UNARCO's continuation of the manufacture and the sale of asbestos–containing products. UNARCO did in fact continue to operate as a going concern and exists to this date despite having filed for reorganization.

Notwithstanding the lack of the first element of product line successor liability, appellants contend that this is an appropriate case to apply successor liability. Appellants maintain that neither the unavailability of the predecessor as a potential defendant, nor the lack of a causal relationship between the transfer of assets and the predecessor's unavailability are appropriate and necessary requisites to successor liability. We disagree.

The product line rule formulated in *Ray,* and adopted by this court in *Abbott Labs.,* has its roots in both corporate law and strict tort liability. Our choice to adopt the product line rule rather than extend the mere continuation exception of corporate law was not an abandonment of traditional rules of corporate succession.

While not analytically subordinate to the traditional corporate rules and their exceptions, the product line rule is neither dominant to the corporate rules.

The relationship established by a transfer of assets is an important limitation on the breadth of *Ray*'s analysis. It frames discussion of *Ray*'s three justifications within a relatively narrow set of circumstances, those in which one corporation transfers its assets to another corporation. In effect, the *Ray* court imposed an expectation upon acquiring corporations that continue the product line of their predecessors. One of the factors such acquiring cor-

porations must consider is the assumption of the acquired corporation's liabilities. Where no acquisition exists, it is difficult to attach such an expectation. The transaction itself is fundamental to the fairness of the *Ray* approach; otherwise imposition of such an expectation on another firm would be gratuitous.

*Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 408, 645 P.2d 689 (1982).

The policy justifications for our adoption of the product line rule require the transfer of substantially all of the predecessor's assets to the successor corporation as a prerequisite to imposing liability on the successor. Two compelling rationales are inherent in this requirement. First, in keeping with the social policies underlying strict products liability, the product line rule is one of necessity. Absent such a rule, the injured plaintiff is left without meaningful remedy. Second, elemental fairness demands that there be a causal connection between the successor's acquisition and the unavailability of the predecessor. Thus, the product line rule strikes a balance between the necessity of compensating the injured plaintiff and the fairness of requiring causation on the part of the defendant. When, as here, there has been no complete transfer of assets, the element of necessity is not present as the plaintiff may look to the original manufacturer; and further, the sale of the product line has no connection to UNARCO's present financial condition.

An examination of the competing policies of strict products liability and corporate acquisitions reveals that an essential purpose of the product line exception is to afford a products liability claimant an opportunity to bring an action against the successor corporation when his or her rights against the predecessor corporation have been essentially extinguished either de jure, through dissolution of the predecessor, or de facto, through sale of all or substantially all of the assets of the predecessor. The successor corporation, operating in a like fashion as the predecessor, is in a sense a continuation of the predecessor.

The paramount policy to be promoted by the rules of strict liability is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. The theoretical foundation of strict liability is that manufacturers who place their products in the stream of commerce impliedly represent their goods as safe for intended use. *See Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975); *Greenman v. Yuba Power Prods., Inc.,* 59 Cal. 2d 57, 377 P.2d 897, 27 Cal. Rptr. 697 (1963); Restatement (Second) of Torts § 402A (1965).

The *Ray* court determined that the strict liability policies of compensation and cost spreading were promoted by imposing liability upon a successor under the circumstances where: (1) the plaintiff's remedy against the defective product's manufacturer was virtually destroyed by the successor's acquisition of the business (the predecessor had liquidated its assets and dissolved its corporate evidence in accordance with the terms of the acquisition agreement within 2 months of its acquisition by the successor); (2) the successor, by its acquisition, had virtually the same capacity as its predecessor—the manufacturer of the defective product—to estimate the risks of product defects and to spread the costs of insuring against those risks to the product's consumers; and (3) the court deemed it essentially fair to require the successor to bear the burden of its predecessor's strict liability because such liability was necessarily attached to the benefits of the predecessor's goodwill and trade name now being exploited extensively by the successor. *Ray v. Alad Corp.,* 19 Cal. 3d 22, 31–34, 560 P.2d 3, 136 Cal. Rptr. 574 (1977). The court ultimately concluded that the policies underlying strict liability were sufficiently promoted so that the policies underlying the traditional rules of corporate successor liability were outweighed. *Ray,* at 25.

A key premise of the product line exception is that successor liability is only appropriate when the successor corporation by its acquisition actually played some role in

curtailing or destroying the claimants' remedies. In such a way, the product line rule strikes a desirable balance between the competing concerns of products liability and a corporation's need to limit its risk exposure. *See Martin v. Abbott Labs.,* 102 Wn.2d 581, 616, 689 P.2d 368 (1984).

Imposing liability upon Pittsburgh Corning would promote the policies of risk spreading and compensation. Indeed, successor liability under any circumstances would promote these policies. It is the element of causation, however, that tips the balance in favor of imposing successor liability. The traditional corporate rule of nonliability is only counterbalanced by the policies of strict liability when acquisition by the successor, and not some later event or act, virtually destroys the ability of the plaintiff to seek redress from the manufacturer of the defective product.

*Ray* itself distinguishes the transfer or acquisition of a business from other events which might affect a plaintiff's remedy. Limiting its holding, the court stated:

> In contrast to the present case in which the injury occurred after the liquidation and dissolution of the manufacturer is the situation found in *Schwartz* v. *McGraw–Edison Co., supra,* 14 Cal. App. 3d 767. . . . [T]he *Schwartz* plaintiff's claim could have been asserted against the original manufacturer as a going concern for a substantial period following the injury, and even after the manufacturer had sold its operating assets the possibility of recovery against it was given practical value by its continued corporate existence and its retention of substantial assets.

*Ray,* at 33 n.6. This distinction was recently applied to the Pittsburgh Corning–UNARCO transaction by the United States District Court for the Northern District of California:

> *Alad* requires more than that the predecessor be non–suable. The first prong of the *Alad* test requires that "the virtual destruction of the plaintiff's remedies against the original manufacturer [be] *caused by* the successor's acquisition of the business." . . . In other words, the very terms of, *Alad* require an element of causation; a successor corporation cannot be held liable for the product lia-

bility torts of its predecessor unless there is a showing that the successor caused—or at least contributed to—the plaintiff's inability to recover against the predecessor. *In re Related Asbestos Cases,* 578 F. Supp. 91, 92–93 (N.D. Cal. 1983). *Accord, Reed v. Armstrong Cork Co.,* 577 F. Supp. 246 (E.D. Ark. 1983).

■ Pittsburgh Corning did not hold itself out to the world as a continuation of UNARCO; neither did it purchase nor receive any goodwill associated with the UNARCO name. Although Pittsburgh Corning did exploit the goodwill associated with the product line, it also informed its Unibestos customers that Pittsburgh Corning was the manufacturing entity. The goodwill transfer contemplated by the product line rule is that associated with the predecessor business entity, not that associated with individual products. *See Abbott Labs.,* at 616–17; *Ray,* at 34.

The requirement of a transfer of the substantial assets of the predecessor together with its goodwill is founded on the policy that the successor has benefited from the predecessor's goodwill and has acquired the resources to compensate the victims of the predecessor's manufacturing defects. The destruction of the predecessor by acquisition and the benefits derived by the successor from the predecessor's product line preserves a sense of balance in the rule of successor liability, making it more than an unbalanced assertion of social policy.

The transaction between UNARCO and Pittsburgh Corning contemplated that UNARCO would continue in existence, hence maintaining its separate goodwill and the resources to compensate the victims of its own manufacturing defects.

We can discern no valid reason for extending the product line exception when the predecessor has not been extinguished, in law or fact, by succession or dissolution.

The case involving Pittsburgh Corning and UNARCO fails to satisfy the elements of the product line exception. Subsequent to the acquisition of the Unibestos product

268

line, UNARCO continued to operate as a going concern and still remains in business to date. Further, no evidence in the record indicates that Pittsburgh Corning's acquisition of the one product line caused any of UNARCO's financial difficulties which resulted in chapter 11 proceedings 20 years later.

We conclude that it would be unjust to impose successor liability on Pittsburgh Corning in this case. Judgment affirmed.

WILLIAMS, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and ANDERSEN, JJ.

PEARSON, J. (concurring)—I concur in the result of the majority for the reasons stated in my concurring/dissenting opinion in *Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984).

UTTER, J., concurs with PEARSON, J.

Reconsideration denied January 14, 1985.