[No. 25061-2-I.    Division One.    September 23, 1991.]

GALL LANDAU YOUNG CONSTRUCTION COMPANY, INC., *Respondent*, v. RICHARD C. HEDREEN, ET AL, *Defendants*, R.C. HEDREEN CO., *Appellant*.

*Gregory R. Harris,* for appellant.

*David H. Karlen* and *Oles, Morrison & Rinker,* for respondent.

WEBSTER, A.C.J. — This appeal concerns the attempt of Gall Landau Young Construction Company (GLY) to hold the R.C. Hedreen Company (R.C. Hedreen),[1] the successor to assets of Parkside Building Company (Parkside), liable for Parkside's debts to GLY. R.C. Hedreen appeals the trial court's judgment that it was a "mere continuation" of Parkside and is therefore liable for Parkside's debts. GLY cross-

---

[1] In this opinion we refer to the R.C. Hedreen Company as "R.C. Hedreen" and to Richard Hedreen individually as "Hedreen".

appeals an earlier judgment that R.C. Hedreen was not an alter ego of Parkside.

## FACTS

In 1985, Richard Hedreen incorporated Parkside Building Company. Hedreen has always been the sole stockholder, as well as an officer and director of Parkside. At all times John Chapman and Gerald Heron were the other officers and directors of Parkside. In 1986, Hedreen hired Parkside to serve as the general contractor in building Jefferson Square. Jefferson Square is located on property owned by the Seattle School District, which entered into a 99-year lease with Hedreen.

In 1986, Parkside contracted with GLY to perform structural concrete work at Jefferson Square. Disputes arose between GLY and Parkside about work performed and payments due. The parties submitted the disputes to arbitration and GLY obtained a judgment of $1,016,415.07 against Parkside. The arbitration award was not appealed. The Superior Court confirmed the award on March 11, 1988.

The R.C. Hedreen Company, which was incorporated in 1970, is also owned solely by Richard Hedreen. Hedreen has always been its president and chief executive officer. At all relevant times, R.C. Hedreen's directors were identical to Parkside's. Prior to Parkside's incorporation, Hedreen, Heron, and Michael Quinn (an employee of R.C. Hedreen) conducted some of the Jefferson Square work through R.C. Hedreen. After Parkside's incorporation, all of the R.C. Hedreen head office employees, furniture, and equipment were transferred to Parkside. Quinn became president and Heron and Hedreen became vice-presidents of Parkside. Their respective salaries were $5,000, $18,500, and $11,500 per month. R.C. Hedreen's business affairs, except those related to the Seattle Hilton Hotel, were taken over by Parkside. R.C. Hedreen ceased to have a head office with a payroll.

During its existence, Parkside worked only for Hedreen or entities wholly owned or closely related to him. In addi-

tion to its Jefferson Square construction contract, Parkside had a contract to remodel the Seattle Hilton (owned by the R.C. Hedreen Co.), and contracts to manage the Park Place Building (50 percent owned by Hedreen) and Jefferson Square after its completion. Parkside employees also provided substantial management services to the Harbor House Apartments, which were originally owned by Hedreen and are now owned by his children or other relatives. The Park Place and Jefferson Square management contracts contained clauses allowing them to be terminated on 90 days' notice without cause. Because of Hedreen's ownership interest in these properties and his relationship with the other owner of Park Place, Hedreen controlled the use of the termination clauses.

When the court entered GLY's judgment against Parkside, Parkside was in desperate financial straits. Hedreen initially capitalized Parkside at $50,000. Because of the construction problems and disputes regarding Jefferson Square, Hedreen apparently stopped paying Parkside under the construction contract. However, Hedreen made loans to Parkside from borrowing sources available to him personally or to R.C. Hedreen in a net amount of approximately $2 million. After the judgment against Parkside was entered, Parkside's liabilities greatly exceeded its assets and it had no prospects for future construction business. Hedreen was unwilling to provide additional capital or loans to keep Parkside going.

On March 18, 1 week after the judgment was entered, Parkside directors Hedreen, Heron, and Chapman met and resolved to transfer Parkside's construction activities to R.C. Hedreen. They also resolved to have Parkside continue its building management activities, subject to review by Parkside's officers on a regular basis. On March 21, GLY garnished Parkside's bank account. On March 23, the same Parkside directors held a meeting characterized as a continuation of the March 18 meeting. At this meeting Parkside decided to transfer all of its building management contracts to R.C. Hedreen. Two days later, R.C. Hedreen

directors Hedreen, Heron, and Chapman had a meeting during which they accepted Parkside's assignment of the management contracts retroactive to March 16. All of Parkside's employees were transferred to the payroll of R.C. Hedreen as of March 16. However, the employees remained in the same offices with the same furniture and equipment doing the same things they did before the transfer.

GLY filed the instant action against R.C. Hedreen on April 15, 1988. GLY alleged that R.C. Hedreen was Parkside's alter ego and was a "mere continuation" of Parkside. On July 26, 1989, the trial court granted R.C. Hedreen's motion for summary judgment as to all of GLY 's alter ego claims.

On October 27, 1989, the trial court found R.C. Hedreen liable solely on the theory that it was a "mere continuation" of Parkside. The court concluded that, since Hedreen controlled the termination clauses of the Jefferson Square and Park Place management contracts, the contracts' value should be determined according to how they were valued by entities owned by Hedreen. In evaluating the contracts, the court relied in part on the testimony of GLY 's expert, Eddie Hendrickson. An expert in the areas of property management and acquisition, Hendrickson testified that the cash flow directly attributable to the management contracts transferred from Parkside to R.C. Hedreen was a valuable asset. He testified that "income streams" produced by the contracts could be invested to earn interest ranging from 8 to 12 percent per year. According to his calculations, the value of the management contracts over their life span using a 10 percent interest rate and discounted to present value equaled $1,263,000. Hendrickson indicated, however, that due to the termination clauses an "outsider" would pay "little if anything" for the contracts initially, and would pay for them only over time.

The trial court found that the Park Place and Jefferson Square management contracts had a combined value in excess of $500,000, that transfer of the management contracts comprised a transfer of substantially all of Parkside's

unimpaired assets, and that R.C. Hedreen did not pay significant or sufficient consideration for the management contracts. R.C. Hedreen assigns error to these findings.

On April 15, 1988, GLY and other creditors filed an involuntary bankruptcy petition against Parkside. Parkside's trustee instituted an adversary proceeding against Hedreen, and obtained a judgment that Hedreen owes Parkside approximately $4 million and that Hedreen's claims against Parkside should be subordinated to those of other creditors. The judgment has been appealed. GLY also sought to collect on its judgment through a lien action, which this court heard last term. *See Pacific Erectors, Inc. v. Gall Landau Young Constr. Co.*, 62 Wn. App. 158, 813 P.2d 1243 (1991).

## SUCCESSOR LIABILITY

We first address whether R.C. Hedreen was a "mere continuation" of Parkside. Washington's successor liability doctrine was summarized in *Hall v. Armstrong Cork, Inc.*, 103 Wn.2d 258, 692 P.2d 787 (1984):

> The general rule in Washington is that a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation, except where: (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability.

*Hall*, at 261-62. *See* 15 W. Fletcher, *Private Corporations* §§ 7122-7133 (1990). The general rule of nonliability is based on the premise that "a sale of corporate assets transfers an interest separable from the corporate entity and does not result in a transfer of unbargained-for liabilities from the seller to the purchaser." *Hall*, at 262. The four exceptions to the general rule were developed "to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions." *Hall*, at 262.

The only exception at issue is the purchaser's "mere continuation". The mere continuation theory is designed to

prevent the corporation from escaping liability "by merely changing hats". 15 W. Fletcher § 7124.10, at 292. *See also Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 562 A.2d 1286, 1293 (1989), *cert. denied*, 318 Md. 323, 568 A.2d 28 (1990). Washington courts have indicated that to prevail on the theory of "mere continuation", proof of at least two elements is required. The first element is "a common identity of the officers, directors, and stockholders in the selling and purchasing companies." *Cashar v. Redford*, 28 Wn. App. 394, 397, 624 P.2d 194 (1981); *accord, Long v. Home Health Servs. of Puget Sound, Inc.*, 43 Wn. App. 729, 735, 719 P.2d 176, *review denied*, 106 Wn.2d 1012 (1986). The second element is "the sufficiency of the consideration running to the seller corporation in light of the assets being sold." *Cashar*, at 397; *accord, Long*, at 736.

R.C. Hedreen argues that an additional, third element of the "mere continuation" theory is the transfer of "all or substantially all" of the seller corporation's assets. The trial court concluded that a transfer of all or substantially all of the seller corporation's assets was essential to the theory of mere continuation. There are cases in other jurisdictions, but none in Washington, requiring transfer of "all or substantially all" of the seller corporation's assets. *E.g., Estey & Assocs., Inc. v. McCulloch Corp.*, 663 F. Supp. 167 (D. Or. 1986). Nevertheless, we agree with the trial court that a transfer of all or substantially all of the predecessor corporation's assets is an implied element of the mere continuation theory. *See Hall*, at 261.

R.C. Hedreen also argues that the court cannot impose successor liability on the theory of "mere continuation" unless only one corporation survives the transfer of assets. There are several cases in which this proposition is stated. *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977); *Jacobs v. Lakewood Aircraft Serv., Inc.*, 512 F. Supp. 176 (E.D. Pa. 1981); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir. 1977). As the trial court correctly stated, however, these cases do not support the conclusion that the dissolu-

tion of the selling corporation after the transfer of assets is a necessary finding.[2]

■ The parties do not dispute that the officers, directors, and stockholders in Parkside and R.C. Hedreen shared a common identity. However, R.C. Hedreen challenges the trial court's conclusions of law as to the remaining elements. R.C. Hedreen contends that the court erred in determining the value of the management contracts transferred from Parkside to R.C. Hedreen. He argues that the court should have applied a fair market value standard, based on what a willing buyer would buy and what a willing seller would sell on the date the assets were transferred. We agree. Hedreen's right to terminate the contracts within 90 days made their present cash value negligible. Even GLY's expert testified that he would pay "little if anything" as a down payment for the contracts. The purpose of the mere continuation theory is to render ineffective a transfer of the debtor corporation's assets when those assets could have been used to satisfy the corporation's debts. In the case at bar, it is difficult to conceive of how the management contracts could have satisfied GLY's debts when the profits would be gleaned only in the future and Hedreen could exercise his power of termination within 90 days.

We conclude that the trial court erred in finding that the management contracts had significant value.[3] Since the management contracts had no significant value and comprised the only assets transferred, insufficient consideration running to Parkside and transfer of substantially all of Parkside's assets cannot be proved.[4] Parkside's inability to

---

[2]The concept of "only one corporation surviving the transfer of assets" appears to be a restatement of the mere continuation theory.

[3]In view of our holding, we need not address whether the trial court erred in assessing liability in an amount exceeding the value of the transferred property.

[4]R.C. Hedreen assumed and paid $27,000 for Parkside's payroll as well as $20,000 of Parkside's accrued debts. Although R.C. Hedreen had "independent reasons for paying some of Parkside's vendors and expenses since non-payment would result in eviction [or] termination of services", the payments nevertheless exceeded the fair market value of the management contracts.

meet its obligations to its creditors did not result from the transfer of the management contracts to R.C. Hedreen. Therefore, no equitable principle would be served in finding R.C. Hedreen to be a mere continuation of Parkside. *See Armour-Dial, Inc. v. Alkar Eng'g Corp.*, 469 F. Supp. 1198, 1202 (E.D. Wis. 1979), *cited in* 15 W. Fletcher § 7125 n.6.[5]

R.C. Hedreen contends that the trial court should dismissed GLY 's successor liability claim as a matter of law because GLY had other legal remedies. Questions of a court's equitable jurisdiction concern whether a court *should* hear a particular action, not whether the court has jurisdiction. 30 C.J.S. *Equity* § 10 (1965). The general rule is that courts will not exercise equity jurisdiction when there is a clear, adequate, complete, and speedy remedy at law. 30 C.J.S. *Equity* §§ 20, 25 (1965) (citing *Roon v. King Cy.*, 24 Wn.2d 519, 166 P.2d 165 (1946)). In order for the court to exercise its equitable jurisdiction, the person against whom the legal remedy is sought must be the same person against whom the equitable remedy is sought. 30 C.J.S. *Equity* § 25 (1965).

R.C. Hedreen asserts that the court should not have exercised equity jurisdiction in this case, since GLY prevailed against Parkside at the trial court level in the bankruptcy action, and against Jefferson Square in the lien action. As GLY points out, however, these remedies were not certain since they had been appealed. In any case, there was no guaranty that these remedies would provide complete relief. Moreover, GLY sought legal judgments against Hedreen

---

[5]R.C. Hedreen contends that the court failed to treat the $4 million judgment obtained by Parkside's bankruptcy trustee against Hedreen as one of Parkside's assets. The bankruptcy trustee had not even initiated the action against Hedreen at the time the assets in question were transferred. Furthermore, Hedreen did not list the $4 million as an asset on Parkside's bankruptcy schedule. Since the money from the judgment was not available to Parkside's creditors when the assets were transferred to R.C. Hedreen, the court did not err in refusing to view the judgment as an asset retained by Parkside.

R.C. Hedreen also contends that the trial court erred in treating Parkside's impaired assets as nonassets. Aside from the management contracts, Parkside's assets totaled approximately $99,944.62. However, a significant portion of this amount was unavailable due to the writs of garnishment that GLY had served on Parkside.

personally and against Parkside; none was sought against R.C. Hedreen. We therefore conclude that the trial court did not err in refusing to dismiss GLY's successor liability claim.

We next address whether the trial court erred in admitting or considering the testimony of GLY's expert, Eddie Hendrickson. R.C. Hedreen claims that Hendrickson's testimony was irrelevant because Hendrickson had no opinion concerning the fair market value of the management contracts as of March 1988, based on what a willing buyer would pay and what a willing seller would sell. Although we hold that the trial court erred in not applying a fair market value standard, we decline to find that the court abused its discretion in admitting Hendrickson's testimony.

## CORPORATE DISREGARD

■ We next address whether the trial court erred in dismissing GLY's corporate disregard claims. Disregarding corporate form to assess liability against the shareholders requires proof of two elements: (1) the corporate form has been intentionally used to violate or evade a duty owed to another, and (2) disregard is necessary and required to prevent unjustified loss to the injured party. *Meisel v. M&N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 409-10, 645 P.2d 689 (1982); *Morgan v. Burks*, 93 Wn.2d 580, 585, 611 P.2d 751 (1980). The trial court did not indicate why it dismissed GLY's corporate disregard claims. R.C. Hedreen argued in its trial brief that GLY had an adequate legal means of achieving complete recovery, and that there was no causal connection between the actions of R.C. Hedreen and GLY's loss.

GLY asserts that the trial court dismissed its corporate disregard claim because GLY had another available remedy, its mechanics' lien. GLY argues that while it must prove that violation of a duty owed will result if the entity is not disregarded, the case law does not preclude the remedy of corporate disregard simply because another remedy may exist. R.C. Hedreen argues that corporate disregard is inap-

propriate when the claimant had or has security available to it at the time the debt was created. In support of this assertion, it relies predominantly on *Uni-Com Northwest, Ltd. v. Argus Pub'g Co.*, 47 Wn. App. 787, 737 P.2d 304, *review denied*, 108 Wn.2d 1032 (1987) and *Truckweld Equip. Co. v. Olson*, 26 Wn. App. 638, 618 P.2d 1017 (1980).

In *Truckweld*, the plaintiff company agreed to extend the defendant company credit on a 30-day open account basis. *Truckweld*, at 641. Noting that the defendant's corporate informalities neither prejudiced nor misled the plaintiff in its consideration of the defendant's credit application, and that meticulous documentation would not have prevented plaintiff's loss, the court refused to pierce the corporate veil. *Truckweld*, at 644. Similarly, in *Uni-Com*, the plaintiff company sold stock in an unrelated company to the defendant company. When the defendant failed to pay for the stock, the plaintiff tried to hold the defendant's shareholders liable by piercing the corporate veil. Relying on *Truckweld*, the court noted that the plaintiff neither sought the shareholder's guaranty nor obtained security. *Uni-Com*, at 799. Furthermore, no causal connection existed between the defendant corporation's failure to respect corporate formalities and the plaintiff's loss. *Uni-Com*, at 799. Thus, the court declined to hold the shareholders liable. *Uni-Com*, at 800.

Neither *Truckweld* nor *Uni-Com* stands for the proposition that the court cannot pierce the corporate veil if other remedies are available. Rather, those cases emphasized the plaintiff's failure to obtain security or a personal guaranty, and rested on a finding that the alleged corporate informalities had no causal relationship whatsoever to the loss suffered by the plaintiff. As the court stated in *Truckweld*:

> Typically, the injustice which dictates a piercing of the corporate veil is one involving fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment.

*Truckweld*, at 644-45 (citing *Morgan*). In both *Truckweld* and *Uni-Com*, the court refused to pierce the corporate veil

because it found no misuse of the corporate entity for the purpose of benefiting the stockholder and depriving the creditor.

In the instant case, GLY has presented no facts supporting a finding that R.C. Hedreen manipulated corporate form in order to violate or evade a duty owed to GLY, or that the remedy of corporate disregard would have prevented unjustified loss to GLY. We therefore decline to overturn the trial court's judgment.

The trial court's judgment holding R.C. Hedreen liable as a successor corporation under the theory of mere continuation is reversed. The trial court's judgment that R.C. Hedreen is not liable under the theory of corporate disregard is affirmed.

FORREST and BAKER, JJ., concur.

Reconsideration denied October 28, 1991.

Review denied at 118 Wn.2d 1022 (1992).