[No. 65883-8.   En Banc.]
Argued May 26, 1998.      Decided July 30, 1998.

EAGLE PACIFIC INSURANCE COMPANY, *Respondent*, v.
CHRISTENSEN MOTOR YACHT CORPORATION, ET AL.,
*Defendants*, CHRISTENSEN SHIPYARDS, LIMITED, *Petitioner.*

*Helen T. Dziuba*; and *Lane & Marshall*, by *Philip G. Marshall* (*Russ Weed* of *McEwen & Gisvold*, of counsel), for petitioner.

*Williams, Kastner & Gibbs, L.L.P.*, by *Scott B. Henrie* and *Margaret A. Sundberg*, for respondent.

DOLLIVER, J. — Eagle Pacific Insurance Company (Eagle Pacific) filed an action against Christensen Motor Yacht Corporation (CMYC) to recover unpaid insurance premiums. Because CMYC was insolvent, Eagle Pacific sought to recover the debt from Christensen Group, Inc. (CGI), Christensen Shipyards, Limited (CSL), and David Christensen personally.

The Court of Appeals held CSL was liable for CMYC's

debts under the successor liability doctrine. *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 85 Wn. App. 695, 934 P.2d 715 (1997). The Court of Appeals remanded for further fact-finding on the separate issue of whether certain cash transfers from CMYC to CGI were fraudulent under RCW 19.40.051(b), part of the Uniform Fraudulent Transfer Act (UFTA). We affirm the Court of Appeals on both issues.

David H. Christensen organized CGI in 1962 to do construction and leasing. In 1985 Christensen and another person organized CMYC to build luxury yachts in Vancouver, Washington. CSL is a third corporation created by Christensen in 1993 or 1994. Christensen is the chief executive officer and sole shareholder of CMYC, CGI, and CSL. In his answer to the sixth amended complaint, Christensen admits that he, CGI, and CSL are all insiders to CMYC.

Eagle Pacific issued two workers' compensation insurance policies to CMYC in 1990 and 1991. These policies were canceled in December 1991 because CMYC failed to pay the premiums. Eagle Pacific claims CMYC's debt arose from these policies, but materials in the record suggest the actual dollar amount owed by CMYC was not calculated by Eagle Pacific until 1993. Eagle Pacific's Sixth Amended Complaint explains the insurance policies involved retrospective premiums, with the amount owed being dependent on the number of claims made against the policies. The Sixth Amended Complaint states CMYC's debt to Eagle Pacific was $268,443 as of August 9, 1993. This August 9, 1993 date was established by a demand letter sent by Eagle Pacific to CMYC on July 9, 1993. The letter states the amount owing was due within 30 days (August 9, 1993).

After attempting, and failing, to collect the debt from CMYC, Eagle Pacific finally filed a court action. On July 29, 1994, Eagle Pacific obtained a judgment against CMYC for $268,443. Because CMYC was insolvent, Eagle Pacific sought to recover the debt from numerous other parties on various legal theories. Only two of those parties are involved here, and just the facts relevant to those claims will be discussed.

The first issue presented for review involves Eagle Pacific's attempt to collect the debt from CSL as a successor corporation to CMYC. Numerous events from 1993 and 1994 are relevant to Eagle Pacific's claim against CSL.

In 1993, CMYC was building three boats, referred to as the Lastebro, Armstrong, and L&L boats. The buyers of the Armstrong and L&L boats paid CMYC in installments as construction progressed. The Lastebro boat was financed by KHD Deutz of America Corporation (KHD Deutz). The financing agreement with KHD Deutz stated CMYC would be deemed in default of the contract if any judgment was rendered against CMYC which CMYC did not satisfy in 10 days. All three boat buyers held security interests in the boat hulls and appurtenances.

Other parties also held security interests in CMYC's assets. In September 1987, Northwest National Bank extended a line of credit to CMYC. Under the credit agreement, the bank retained security interests in "essentially all assets of CMYC." 1 Clerk's Papers at 16. No exhibits can be found in the record clarifying what particular assets were encumbered by the bank's lien. The amounts CMYC borrowed against its credit line varied over the years, but as of December 1993, CMYC reached the credit limit and owed $1.2 million to Northwest National Bank.

Christensen personally guaranteed completion of the three boats to the buyers, and Christensen and CGI had also guaranteed payment of the loans made by KHD Deutz. Because of these personal guarantees, Christensen had a strong incentive to see that the boats were completed and delivered to the buyers.

Christensen admits CMYC was, or became, insolvent in 1993. The buyers' payments on the boats were not covering all costs. In July 1993, after extensive arbitration, Lloyd's of London was awarded $332,250 against CMYC. This amount was supplemented in September 1993, bringing the total award to $447,250. Eagle Pacific's demand letter, discussed above, was also sent to CMYC in July 1993.

Because of CMYC's outstanding debts to Lloyd's of

London and Eagle Pacific, KHD Deutz threatened to declare CMYC in default of the financing agreement on the Lastebro boat. For December 1993 and January and February 1994, KHD Deutz suspended installment payments on the construction of the Lastebro boat. Christensen was worried the buyers of the other two boats would also suspend payments. Christensen explained the situation in an affidavit:

> The only remaining way to convince KHD Deutz to resume advancing funds for completion of the Lastebro boat, and to assure that the three boat buyers would not all stop making progress payments on their boats, was to form a new corporation to complete the boats, under terms acceptable to KHD Deutz and the three buyers, and which did not have CMYC's financial burdens.

1 Clerk's Papers at 20. Christensen then created Christensen Shipyards Limited (CSL) to complete the boats. CSL, being unburdened by any of CMYC's debts, was able to obtain a line of credit from U.S. National Bank. CSL subcontracted with CMYC to finish construction of the three yachts. CSL paid nothing to take over the yacht contracts, but if the contracts ultimately yielded a profit, the subcontract agreement contained a formula whereby CSL was to pay a percentage of the profits to CMYC. CSL paid $70,000 to CMYC for supplies inventory, and CSL agreed to pay CMYC $5,500 per month to lease CMYC's machinery and equipment to be used in the construction of the boats.

CMYC did not own the facilities where the yachts were constructed. Christensen states in his affidavit that CMYC was subleasing the space from CGI. After CSL took over the yacht contracts, CMYC forfeited its lease of the building to CGI, and CSL began renting the same space. In the end, CSL, with the same employees and in the same facilities, continued construction of the same three yachts. Eagle Pacific claims CMYC, for all purposes, ceased to exist. Christensen alleges CMYC continues to do business, and at the time he filed his affidavit in 1994 the company was build-

ing a crane for the owner of a boat previously built by CMYC.

In superior court Eagle Pacific argued two theories why CSL was liable for CMYC's debts under the successor liability doctrine. First, Eagle Pacific claimed CSL was liable because it was a "[m]ere continuation" of CMYC. 2 Verbatim Report of Proceedings at 24 (Oct. 28, 1994). As a second and alternative ground for imposing liability, Eagle Pacific claimed CMYC's transfer of assets to CSL was fraudulent. The trial court granted partial summary judgment to Eagle Pacific on this issue, and the Court of Appeals affirmed. CSL's successor liability for CMYC's debts forms the first issue we review.

The second issue presented for review involves the question of whether Eagle Pacific can look also to CGI to recover all or part of CMYC's debts. Additional facts regarding CGI's involvement with CMYC must be recited to aid in our analysis of this second issue.

When CMYC struggled financially, CGI and Christensen loaned large amounts of cash to CMYC. Christensen submitted evidence detailing CGI's cash transfers to CMYC during 1993. Christensen's exhibit also shows CMYC making numerous cash transfers back to CGI. Christensen claims such transfers between CGI and CMYC occurred in the normal course of business and had been going on for years.

CGI's loans to CMYC in the beginning of 1993 were unsecured; but, on or about August 18, 1993, CMYC granted CGI a security interest in most, if not all, of CMYC's assets. The agreement created a security interest in CMYC's "inventory, stock in trade, equipment, fixtures, tools, parts, accessories, supplies, furnishings, bank accounts, accounts, general intangibles, and work in progress (the Collateral)." 1 Clerk's Papers at 65. The agreement specifies the security interest was subordinate to prior security interests including Northwest National Bank and KHD Deutz. An additional security interest was granted to CGI on or about November 22, 1993. CGI perfected its security interests against CMYC.

Eagle Pacific argues the cash transfers from CMYC to CGI, prior to creation of CGI's security interest in August 1993, violate RCW 19.40.051(b). Eagle Pacific claims that, prior to creation of CGI's security interest, CMYC transferred more cash to CGI than CGI transferred to CMYC. These transfers allegedly resulted in a net draw down of CMYC's assets, thereby favoring an insider creditor to the detriment of Eagle Pacific. Eagle Pacific claims CMYC transferred over $500,000 to CGI in the first half of 1993. The trial court agreed and held CGI liable under RCW 19.40.051(b).

The Court of Appeals found further questions of fact remained as to CGI's liability to Eagle Pacific under the UFTA. *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 85 Wn. App. 695, 934 P.2d 715 (1997). The Court of Appeals addressed other issues in its opinion, but those other issues have not been presented for review before this court.

First issue: Is CSL liable for CMYC's debt to Eagle Pacific as a successor corporation?

■ Normally, when a corporation sells its assets to another corporation, the purchasing corporation does not become liable for the debts of the selling corporation. *Hall v. Armstrong Cork, Inc.*, 103 Wn.2d 258, 261, 692 P.2d 787 (1984). The rationale for this rule is a "bona fide purchaser who gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims." *Hall*, 103 Wn.2d at 262. Four exceptions to this rule of nonliability exist. Successor liability is imposed if:

> (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability.

*Hall*, 103 Wn.2d at 261-62. Liability may be imposed regardless of the exact form of transfer of assets between the corporations. *Stoumbos v. Kilimnik*, 988 F.2d 949, 961 (9th Cir. 1993) (applying Washington law).

The trial court found CSL liable under the mere continuation exception to the nonliability rule. The Court of Appeals reversed the trial court on this issue. The trial court's ruling on the mere continuation theory was inconsistent with the trial court's later factual finding that Eagle Pacific failed to prove CMYC's transfer of assets to CSL lacked sufficient consideration. None of the briefing before this court challenges the Court of Appeals' ruling with regard to the mere continuation doctrine, so we do not consider the issue.

The Court of Appeals ruled a different theory nonetheless supported imposition of successor liability on CSL. The appellate court held the findings of fact supported application of the fraudulent transfer theory—a theory which Eagle Pacific also presented to the trial court. The appellate court relied upon the trial court's finding "that CSL was created for the sole purpose of hindering CMYC's creditors." *Eagle Pac.*, 85 Wn. App. at 707. Even though Eagle Pacific failed to prove that the transfer of assets lacked sufficient consideration, the facts demonstrated CMYC's transfer of assets to CSL was designed to avoid the reach of creditors.

CSL's Petition for Review asserts a transfer of assets between corporations can never be fraudulent absent a showing of insufficient consideration: Eagle Pacific failed to prove CMYC's transfer of assets to CSL lacked consideration, so the transfer cannot be fraudulent. CSL's argument oversimplifies the fraudulent transfer ground for imposing successor liability.

CSL is correct in its analysis when it states numerous cases have looked to adequacy of consideration in determining whether a transfer of assets was fraudulent. Adequate consideration for a transfer of assets between a buying and selling corporation is an important element when determining whether to impose successor liability. If the buying corporation pays sufficient consideration for the seller's assets, the selling corporation's creditors can then seek to satisfy their judgments from the sale proceeds. If

the sale proceeds are equivalent in value to the transferred assets, then, assumedly, but not necessarily, no harm has been done to the creditors of the selling corporation.

In some situations, however, the selling corporation has intangible assets on which it is difficult to place a value. CSL paid nothing to CMYC for CSL's assumption of the yacht contracts. The only benefit CMYC received for transferring the yacht contracts was a contractual promise by CSL to share a percentage of profits, if any, resulting from CSL's completion of the yachts. CSL argues the yacht contracts had no market value since any potential profit from completing the contracts was too speculative.

Eagle Pacific was unable to prove that these yacht contracts had a current market value; but this does not diminish the harm resulting to Eagle Pacific when CSL took over the yacht contracts. By taking over the contracts, CSL thereby became entitled to future installment payments on the construction of the boats—payments from which Eagle Pacific could have satisfied its debts had CMYC continued the contracts. Indeed, as a result of CSL's taking over the contracts, Eagle Pacific lost the right to recover any of the future payments and potential future profits deriving from the construction of the three boats. CMYC used Eagle Pacific's insurance services without fully paying for those services; and, by CSL's taking over CMYC's operations, CSL ultimately yields the profits from CMYC's operations while cutting off Eagle Pacific's ability to recover its debts.

Eagle Pacific's inability to establish inadequate consideration does not preclude a court from finding the transfer of assets was fraudulent. None of the cases cited by CSL hold insufficient consideration is a *necessary* element for a finding of fraud. Rather, insufficient consideration is merely a sufficient element.

The fraudulent transfer theory is usually discussed as having at least two alternative elements. "[I]t is generally held that if one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the

debts of the selling corporation exists *in the absence of fraud* or agreement to assume the debts." 19 Am. Jur. 2d *Corporations* § 2704 (1986) (emphasis added); *see also* 15 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 7125 (perm. ed., rev. vol. 1990) (hereinafter Fletcher Cyc. Corp.) ("But where a corporation receives *in good faith* a transfer of the assets of another corporation, *and* pays full consideration, the transfer is not fraudulent.") (emphasis added). Both treatises show fraud can be present despite the payment of adequate consideration. Case law from our jurisdiction and other jurisdictions supports our reading of these treatises.

In *Culinary Workers & Bartenders Union, Local 596 v. Gateway Cafe, Inc.*, 91 Wn.2d 353, 588 P.2d 1334 (1979) (*Gateway*), this court held Bypass Sales, Inc., a successor corporation to Gateway, was liable for the debts and other contractual responsibilities of the predecessor Gateway corporation. Evidence showed the creation of Bypass and dissolution of Gateway were "designed to avoid their settlement responsibilities." *Gateway*, 91 Wn.2d at 367. The court observed:

> The dissolution eventually left Gateway without a single asset. Bypass, a new corporation with substantially identical ownership, operating the identical business with identical employees in an identical location to Gateway, received all Gateway's assets.

*Gateway*, 91 Wn.2d at 367. Although the court did not specifically state under which theory of successor liability Bypass was liable, the court's language stated the transfer of assets was *designed to avoid Gateway's responsibilities* to the Culinary Workers and Bartenders Union. This description suggests the imposition of liability fell under the fraudulent transfer theory. The amount of consideration Bypass paid for Gateway's assets was not discussed in the decision. The important factors discussed by the court were the identity of parties behind each corporation and the bad faith reason behind the transfer of assets.

In *Long v. Home Health Servs. of Puget Sound, Inc.*, 43

Wn. App. 729, 719 P.2d 176 (1986), an employee of a nurs-
ing home sued the successor corporation of the home for
back wages owed by the predecessor corporation. The Court
of Appeals held the sale of assets between the two corpora-
tions was in good faith and for full consideration, thereby
negating the plaintiff's fraudulent transfer argument.
*Long*, 43 Wn. App. at 738. The decision explicitly relied on
*two* different factors—adequate consideration *and* good
faith. *Long*, 43 Wn. App. at 737-38. The court also observed
that there was no common identity between the operators
of the two corporations. *Long*, 43 Wn. App. at 736. *Long*
demonstrates consideration is not the conclusive issue
under the fraudulent transfer theory—there is also an is-
sue of whether the transfer is in good faith.

In *Stoumbos v. Kilimnik*, 988 F.2d 949 (9th Cir. 1993), a
bankruptcy trustee sought to impose successor liability on
a new corporation, where both the predecessor and succes-
sor corporations were run by Walter Kilimnik. The court
discussed both the mere continuation and the fraudulent
transfer theories. The transfers between the debtor and
the successor corporation were complicated, and it was dif-
ficult to determine whether the purchasing corporation had
paid sufficient consideration for the seller's assets. The
court ultimately ruled it was not necessary to decide on the
adequacy of consideration:

> Because we conclude that successor liability may exist based
> on the fraud-to-creditors theory, at this juncture we need not
> decide the extent and adequacy of the consideration and the
> bankruptcy court may not need to do so on remand.
>
> The circumstances of this case indicate that Kilimnik may
> be liable as a successor under a fraud-to-creditors theory.

*Stoumbos*, 988 F.2d at 962. The court then went on to
discuss how Kilimnik's actions left the debtor corporation
with substantial liabilities. The court's analysis demon-
strates consideration is not a necessary element of the
fraudulent transfer theory.

Cases from other jurisdictions support imposing succes-

sor liability on CSL under the fraudulent transfer exception. In *Avery v. Safeway Cab, Transfer & Storage Co.*, 148 Kan. 321, 80 P.2d 1099 (1938), the plaintiff was injured on March 17, 1935, by a taxicab owned and operated by Peoples Taxicab Company. *Avery*, 80 P.2d at 1100. On July 20, 1935, Avery sued Peoples Taxicab for damages. On that same day, all of Peoples Taxicab's assets were transferred to Safeway Cab, Transfer & Storage Company. With one exception, the stockholders, directors and officers of both companies were identical. *Id.* The court held Avery could look to Safeway Cab for her damages:

> [W]here the transfer of assets strips a debtor corporation of all its assets, and disables the corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment of their due, the net result is in legal effect a fraud; and the courts will subject the transferee to liability for the satisfaction of claims against the corporation whose assets it has absorbed.

*Avery*, 80 P.2d at 1101.

*Avery* applies to the facts of this case. CMYC's principal business purpose was the construction of yachts. In the course of the construction of the three yachts, CMYC incurred debts which it could not pay. With the transfer of the three yacht contracts to CSL, and CMYC's surrender of its employees and facilities to CSL, CMYC was stripped of its main potential source for future revenues. Christensen admits the yacht contracts were transferred to CSL to allow the continuation of construction on the yachts unhampered by creditors' efforts to collect unpaid bills.

Christensen's admitted reason for the transfer of assets from CMYC to CSL fits the definition of a fraudulent transfer. Eagle Pacific's inability to prove CSL paid insufficient consideration for the transferred assets does not automatically purge the transaction of fraud. The intent behind the transfer of assets can render the transaction fraudulent, as demonstrated by two recent cases involving asbestos claims. In Oregon state, Raymond Schmoll sued Raymark Industries, Inc. (Raymark) and Raytech Corpora-

tion (Raytech) for damages arising from Schmoll's asbestos-caused injuries. *Schmoll v. ACandS, Inc.*, 703 F. Supp. 868 (D. Or. 1988), *aff'd*, 977 F.2d 499 (9th Cir. 1992). Raymark originally stood as a single corporation with five different divisions. Two divisions, Wet Clutch & Brake and Raybestos Industrie—Produkte G.m.b.H (RIPG), a German subsidiary, were very profitable, and had not generated asbestos liabilities. Through a series of complicated transactions involving numerous corporate shells, Wet Clutch & Brake and RIPG, the profitable divisions, ended up being owned by Raytech, and the other three liability-ridden divisions were owned by Raymark. *See Schmoll*, 703 F. Supp. at 870-71.

Schmoll successfully argued that Raytech was liable for Raymark's manufacture and distribution of asbestos-containing products. The District Court, following Oregon law, imposed liability under the fraudulent transfer theory. Rather than dwelling on the nature or amount of consideration involved in the complicated transactions, the court found the elaborate transfer of assets "was designed with the improper purpose of escaping asbestos-related liabilities." *Schmoll*, 703 F. Supp. at 874. The court held "Raymark Industries should not be allowed to avoid liability by transferring its profitable assets leaving no more than a corporate shell unable to satisfy its asbestos-related obligations." *Schmoll*, 703 F. Supp. at 874.

Seven years after *Schmoll* was decided, Raytech filed for bankruptcy and sought a declaration from the bankruptcy court holding Raytech immune from Raymark's asbestos-related liabilities. *See Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995). The main issue was whether *Schmoll* collaterally estopped Raytech from relitigating the issue of its successor liability for Raymark. The United States District Court found *Schmoll* did estop Raytech from relitigating the issue, and the Third Circuit Court of Appeals, after conducting a detailed analysis of *Schmoll*, affirmed the District Court. *Raytech*, 54 F.3d at 196.

One challenge in *Raytech* was that Oregon's successor li-

ability law was unique, and its holding did not apply in other jurisdictions. The Third Circuit disagreed. "To impose liability on the successor corporation, the law in every jurisdiction, including Oregon, requires a finding that the corporate transfer of assets 'is for the *fraudulent purpose* of escaping liability.'" *Raytech*, 54 F.3d at 192 (quoting Fletcher Cyc. Corp. § 7122, at 232). The court subsequently clarified the meaning of "fraudulent" as used in the successor liability doctrine: "Under Fletcher's articulation of the exception, transferring corporate assets for the purpose, or with the intention, of escaping liability is, by definition, a transfer of assets with fraudulent purpose." *Raytech*, 54 F.3d at 192.

Raytech also sought to avoid collateral estoppel by arguing essential facts had changed since *Schmoll* was decided in 1988. Raytech argued *Schmoll* imposed successor liability because Raytech's acquisition of RIPG and Wet Clutch & Brake lacked consideration. Raytech argued to the Pennsylvania court that, since *Schmoll* was decided, it had paid over $63 million to Raymark for the two profitable divisions. *Raytech*, 54 F.3d at 193. The Third Circuit ruled the amount of consideration paid was not an essential factor in *Schmoll*'s holding:

> While [*Schmoll*] also placed some emphasis upon the facts that Raytech had passed unsecured notes and Raytech stock of questionable value to Raymark as part of the purchase price for RIPG and Wet Clutch & Brake, the court appears to have been equally troubled by the fact that the restructuring left Raymark's creditors without access to the potential stream of profits generated by RIPG and Wet Clutch & Brake. *See Schmoll*, 703 F.Supp. at 873. This latter concern would have been warranted regardless of the value of the consideration passed by Raytech to Raymark.

*Raytech*, 54 F.3d at 194. The Third Circuit observed that *Schmoll* "doubted the *bona fides* of the sale of Raymark . . . following the purchase by Raytech of Raymark's profitable assets." *Raytech*, 54 F.3d at 194. The overall context of the multilayered corporate transactions "smacked of dubious intent." *Id.* Finally, the court concluded:

We also note that it was not the failure or the inadequacy of consideration proffered by Raytech for the purchase of Raymark's profitable assets that so deeply troubled the court in *Schmoll*; instead the court viewed the transaction as rife with improper intent . . . .

*Raytech*, 54 F.3d at 195. *See also National Carloading Corp. v. Astro Van Lines, Inc.*, 593 F.2d 559, 563 (4th Cir. 1979) ("Without the *bona fides* on the part of the grantee, the valuable consideration has no effect in rescuing the transaction from the literal terms and spirit of the Statute.") (internal quotation marks omitted) (applying Virginia State law).

CSL is simply incorrect in its claim that adequate consideration precludes a finding of fraudulent transfer of assets. The fraudulent transfer theory has always required consideration *and* good faith, as mentioned in *Long v. Home Health Servs. of Puget Sound, Inc.*, 43 Wn. App. 729, 738, 719 P.2d 176 (1986) and as illustrated by *Avery*, *Schmoll*, and *Raytech*. Numerous factors may be relevant when determining good faith. The common ownership of the buying and selling corporations casts a suspicion on the transactions. *Cf. Dummer v. Wheeler Osgood Sales Corp.*, 198 Wash. 381, 391, 88 P.2d 453 (1939) (" 'Undoubtedly, it is the general rule that mere common ownership of the capital stock or interlocking directorates, or like evidences of close association, will not justify the courts in disregarding corporate identities, but where, as here, the identities are so confused and intermingled as to result in probable fraud upon third persons dealing with the corporations or either of them, whether fraud be actually intended or not, then the exception to the rule will apply, and the exception is as well established as the rule itself.' ") (quoting *Associated Oil Co. v. Seiberling Rubber Co.*, 172 Wash. 204, 207-08, 19 P.2d 940 (1933)). A corporation's purchase of another corporation's assets is more likely to be an arm's-length transaction when there is no common identity between the corporations and individuals involved.

Good faith, or the lack thereof, ultimately rests upon the

intent of the parties involved in the transaction. Transferring assets to another corporation to hinder or delay creditors is by definition a fraudulent transfer. *Raytech*, 54 F.3d at 192. In his own words, Christensen admits the transaction was designed to continue building the yachts without interference from creditors:

> The only remaining way to convince KHD Deutz to resume advancing funds for completion of the Lastebro boat, and to assure that the three boat buyers would not all stop making progress payments on their boats, was to form a new corporation to complete the boats, under terms acceptable to KHD Deutz and the three buyers, *and which did not have CMYC's financial burdens*.

1 Clerk's Papers at 20 (emphasis added). In the course of conducting business and building yachts, CMYC incurred debts which Christensen sought to avoid by transferring the business to CSL. Because the assets were transferred to CSL to avoid the reach of the creditors, the transaction is fraudulent and successor liability attaches to CSL. The fact that the transaction was designed to "save the business" does not defeat imposition of successor liability. We affirm the Court of Appeals as to CSL's liability.

Second Issue: Do the facts support summary judgment for Eagle Pacific against CGI under RCW 19.40.051(b)?

The trial court found CMYC had transferred cash to CGI in violation of RCW 19.40.051(b). The Court of Appeals reversed the trial court's partial summary judgment, finding further questions of fact existed. The Court of Appeals focused on the issue of whether the transferred assets were encumbered by valid security interests.

RCW 19.40.051(b) states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Two critical factual issues regarding application of RCW

19.40.051(b) to this case are presented. The first issue regards when Eagle Pacific's claim accrued. The second issue involves whether the transferred assets are subject to the UFTA.

■ RCW 19.40.051(b) applies to transfers only if the transfers occurred *after* the creditor's claim arose. The UFTA gives a very broad definition of a claim:

> "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

RCW 19.40.011(3). Before the trial court can analyze any particular transfers for possible violation of the UFTA, the court must first establish the date upon which the creditor's claim arose. We can find no documentation in the record supporting Eagle Pacific's assertion that its claim arose as of December 1991.

Eagle Pacific's various pleadings filed before the trial court only imply CMYC's debt arose as of December 1991 for failure to pay premiums on the 1991 and 1990 workers' compensation insurance policies. It may be that Eagle Pacific's claim can be considered an "unmatured" right to payment as early as December 1991, thereby satisfying the definition of a claim under the UFTA. If the policies involved retrospective premiums, however, it could be argued Eagle Pacific's right to payment did not arise until Eagle Pacific actually submitted the bill to CMYC in July 1993. This is a novel issue not addressed by the parties, unresolved in the record, and it precludes summary judgment. Questions of fact remain as to when Eagle Pacific's claim arose.

■ The second unresolved issue involves whether the assets transferred from CMYC to CGI are subject to the UFTA. The UFTA defines "transfer" as any means of disposing of an asset. RCW 19.40.011(12). "Asset" means the property of the debtor, but does not include "[p]roperty to the extent it is encumbered by a valid lien[.]" RCW

19.40.011(2)(i). A "lien" is defined, in part, as "an interest in property to secure payment of a debt[.]" RCW 19.40.011(8). Simply put, if a debtor transfers assets unencumbered by security interests, that transfer may be analyzed for fraud under RCW 19.40.051(b); but, if the debtor transfers assets encumbered by security interests, that transfer is beyond the reach of the statute.

As mentioned in the summation of the facts above, CGI did not hold a security interest in any of CMYC's assets prior to August 1993. CGI's security interest was created on or about August 18, 1993. In the months (and possibly years) prior to this date, CGI made numerous loans to CMYC, and CMYC periodically made loan repayments back to CGI.

CGI argued before the Court of Appeals that *any* of the cash transfers from CMYC to CGI are outside the scope of the UFTA because of the existence of *other* security interests in those assets. The three yacht buyers held security interests in the boats, supplies and accessories. CMYC's line of credit with Northwest National Bank included the bank's holding security interests in essentially all of CMYC's assets.

Eagle Pacific argues CGI failed to demonstrate two important facts. First, Eagle Pacific claims CGI failed to prove on the record the cash assets transferred from CMYC to CGI were in fact encumbered by valid liens held by the bank or any other secured party for that matter. Secondly, Eagle Pacific points out the record shows only the bank's line of credit was fully extended as of December 1993—nothing in the record shows how much CMYC owed the bank on the credit line in the first half of 1993 when the challenged transfers to CGI occurred. Eagle Pacific claims CGI's failure to establish these facts supports the trial court's grant of partial summary judgment, but we agree with the Court of Appeals and find CGI's arguments sufficiently raise questions of fact requiring a remand.

In conclusion, we affirm the imposition of successor liability on CSL, and we affirm and remand on the issue of CGI's liability under the UFTA.

DURHAM, C.J., and SMITH, GUY, JOHNSON, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.