MICHIGAN MUTUAL LIFE INSURANCE COMPANY *v.* GRAN-
VILLE L. COLEMAN *et al.*

[(*Nashville.*  December Term, 1906.)

1. **VERDICT.** Order setting aside verdict not disturbed where
matters involved are debatable upon the evidence.

  Where the matters involved in the verdict are fairly debatable
  upon the evidence, the order of the chancellor setting aside the
  verdict, on the ground that it was not sustained by the evidence,
  and granting a new trial, will not be disturbed upon appeal.
  (*Post, p.* 231.)

  Case cited and approved:  Baugh v. Railroad, 98 Tenn., 119, 121,
  122.

2. **LIFE INSURANCE.** Right of general agent by contract to
percentage on renewals after discharge without fault, when.

  Where, under a written contract between a life insurance company
  and its general agent for a certain territory as properly con-
  strued by the court by a view of the contract itself and by the aid
  of the practical construction afforded by the conduct of the par-
  ties in respect thereof, the agent's percentage on renewal pre-
  miums or on premiums accruing on policies after the first year
  constituted part of his compensation for obtaining insurance,
  his interest in such renewals or subsequent accruing premiums
  on insurance obtained by him was not forfeited by his discharge
  without cause, assuming that the company had the right to dis-
  charge him at pleasure.  (*Post, pp.* 231-235.)

  Numerous cases cited in the opinion, on page 235.

3. **SAME.** Extension of agency by amendment to contract for a
definite period, when.

  A contract of agency without any provision as to its life is ex-
  tended in all of its aspects by an amendment thereto changing

certain terms thereof and providing that the amendment shall be effective from a certain date to a future fixed date. (*Post, p.* 234.)

4. **SAME.** Agent's damages for principal's breach of contract are not remote or too speculative for allowance, when.

Where the general agent of a life insurance company under a contract indefinite as to time, but made definite by an amendment, with fixed rate of commission, the damages for his discharge without cause during such time are not remote or too speculative for allowance, where there is evidence of his efficiency as a general agent, and of the amount written by his successor, and of proper deductions for expenses. (*Post, pp.* 235-237.)

Numerous cases cited in the opinion, on pages 236, 237.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.—JOHN ALLISON, Chancellor.

MR. JUSTICE NEIL made the following statement of facts:

Some years prior to the beginning of the present litigation the complainant company and the defendant Coleman entered into a contract of which the following is a copy:

"This agreement, made this 8th day of September, one thousand eight hundred and ninety-eight, by and between Granville L. Coleman, of Columbia, State of

Tennessee, of the first part, and the Michigan Mutual Life Insurance Company, of Detroit, Michigan, of the second part:

"Witnesseth: The said party of the first part, in consideration of the covenants and agreements of the said party of the second part hereinafter contained, hereby agrees to engage in the service and employ of said party of the second part as one of its State agents in that portion of Tennessee east of Tennessee river, and west of the counties of Clay, Jackson, Smith, De-Kalb, Warren, Grundy and Marion, State of Tennessee, and agrees to devote his entire time and to use his best efforts to promote and make successful the business of said party of the second part, in the territory aforesaid; to procure applications for insurance; to collect, so far as practicable, when authorized so to do by the said company, when due, all premiums payable to the said company; and to deliver, upon such collection, the policies and renewal receipts sent by the said company for that purpose.

"He also agrees to remit all sums due the said company immediately upon collection by sight draft on Detroit or New York, or post office order, or in current funds by express; and in case of his inability to collect the premiums upon policies and renewal receipts sent to him, he agrees to return to the said company such policies and renewal receipts, in accordance with the rule of the said company, or whenever he may be directed to do so by said company, and in the conduct of his

business to be governed in all respects by the instructions, rules, and regulations of the said company or its officers. He also further agrees to solicit applications for life insurance only for the Michigan Mutual Life Insurance Company of Detroit, Michigan, and to forward to said company every application obtained.

"For and in consideration of the services above described, and in compensation in full therefor, the said Michigan Mutual Life Insurance Company hereby agree to pay to the said party of the first part a commission upon all business taken by him and paid for in cash, according to the following schedule, which shall be the commission basis of this agreement: [Here follows an enumeration of twenty-four different kinds of policies, or forms of policy contracts, with the first year's percentage of the premium allowed to the agent, ranging from fifty per cent. to seventy-five per cent.]

"Upon all business which shall be procured or signed by more than one agent, the said company shall pay but one commission, and the settlement statement accompanying the application shall contain directions to the said company as to what proportion of that commission each agent shall receive.

"It is understood and agreed by and between the parties hereto that upon the termination of this contract at any time, the said company is empowered to transfer the business of the party of the first part to such person or persons as it may designate.

"It is further understood and agreed that all com-

missions shall cease after the first full annual premium has been collected, and the above-named commissions shall not be allowed on the second or any subsequent annual premium.

"And the said company agrees to pay said party of the first part a collection fee of 7 1-2 per cent. upon all second and subsequent years' premiums collected by him in cash, except on nonparticipating policies noted above.

"In all cases where notes or other obligations, or any renewal thereof, are accepted for extensions of the time of payment of any first or subsequent year's premium, no commissions shall accrue or become due until such notes or other obligations are paid in cash to the said company; and it is understood and agreed that the cost of collection (by suit or otherwise) shall be deducted from the commissions upon the notes on account of which the expense and costs were incurred.

"It is further distinctly understood and agreed that the party of the first part is not authorized to make, alter, or discharge contracts, waive forfeitures, name an extra rate for special risks, or bind the said company in any way whatever, whether in reference to policies of insurance, or to advertising, printing, rent of office, or any other expense of business; and the party of the first part hereby stipulates that he will not thus undertake to act for the said company, or to make it responsible for any such act, and that he will not collect renewal premiums, unless upon receipt furnished to him for that purpose, his duties being simply such

as are described in this agreement, and in the rules and instructions of the said company, and that he will not deliver policies or renewal receipts, except on payment in cash of the premiums or settlement by good note as provided in these instructions.

"In case the party of the first part shall violate any of the provisions of this agreement, or fail to reasonably increase the business of the said company, the party of the second part may at any time terminate this agreement. Should the party of the first part, by himself or by collusion with any medical examiner, policy holder, applicant for a policy, or any other person, defraud the said company, or wrongfully increase the liability, by any corrupt act or false representation, or attempt thus to defraud or wrongfully increase the liabilities of the said company; or should he fail to remit to the said company as required by this agreement money collected by him, or to make every or any report required of him, then in every such case all rights of the said party of the first part under this agreement shall become and be forfeited to said company, and the said company shall thereupon be discharged from every liability to the said party of the first part." .

Signed by the parties.

To this contract from time to time, by agreement of parties, certain amendments were made in writing which are as follows:

(1)  "The expense account mentioned in a slip heretofore attached to the contract between the Michigan

Mutual Life Insurance Company and Granville L. Coleman, naming seventy-five dollars per month for such purpose, is hereby extended to March 31, 1902. T. F. Giddings, General Superintendent of Agencies."

(2) "The commission on the provident plan (payment of premiums in monthly installments) on business written on and after May 1, 1901, in accordance with premiums given in rate book, dated April 15, 1901, will be seventy-five per cent. on the first twelve successive installments of monthly premiums, and twenty per cent. on all following successive installments or monthly premiums.

"This amended agreement to be attached and form a part of the contract between the Michigan Mutual Life Insurance Company and G. L. Coleman. T. F. Giddings, General Superintendent of Agencies."

(3) "Commission on provident business will be seventy-five per cent. on the first twelve monthly installments of premiums paid in cash; fifteen per cent. on successive installments of monthly premiums for five years thereafter; ten per cent. on all monthly installments or premiums after 6 years from date of policy. Dated February 1, 1900. Theron F. Giddings, General Superintendent of Agencies.

This supplemental to be attached and become a part of the original contracts between the Michigan Mutual Life Insurance Company and G. L. Coleman."

(4) "Quarterly provident policy commissions:

"Commissions on the quarterly premium provident

policy will be seventy per cent. on the first four consecutive quarterly premiums and ten per cent. on all succeeding quarterly premiums paid in cash to the company. T. F. Gidings, General Superintendent of Agencies. Detroit, Mich., July 1, 1902."

(5) "In order to cover an advance, the commissions on the provident policies, with premiums payable quarterly, will be one hundred per cent. of the first quarter's premium, and sixty per cent. of the remaining three quarters of the first year's premium. Dated July 1, 1902. T. F. Giddings, G. S. of A."

"Detroit, Mich., Jany. 1, 1903. Please attach to your contract."

(6) "The following schedule of commissions will be paid on the regular nonparticipating business written after December 31, 1902:

10-payment life ........................40 per cent.
10-payment endowment ................40 per cent.
15-payment life ........................50 per cent.
15-payment endowment ................50 per cent.

All other regular nonparticipating policies sixty per cent.

"Renewal or collection fee on second and subsequent years will be 7 1-2 per cent. This arrangement takes the place of the former commission schedule of sixty-five per cent. on first year's business, and five per cent. on subsequent years, only on business written after December 31, 1902. On business written previous to said date, the schedule of sixty-five per cent. and five per cent.

will govern. Yours truly, T. F. Giddings, General Superintendent of Agencies."

(7)  "On policies not heretofore provided for, commissions will be allowed as per following schedule:

Whole life, installment option

(taking place of whole life

participating)  ................65%, renewals 7½%

20-payment life installment

option  ......................50%, renewals 7½%

20-payment guarantee accum-

ulation  ....................60%, renewals 7½%

5-year renewable terms joint

life (partnership policy)  ......60%, renewals 7½%

Joint life (regular)  ............60%, renewals 7½%

"Dated Detroit, Jan. 1, 1903.  T. F. Gidings, General Superintendent of Agencies."

(8)  "Detroit, Mich., July 1, 1903.  G. L. Coleman, State Agent, Columbia, Tenn. — Dear Sir: In case the general agents desire an advance on the provident policies with premiums payable quarterly, it will be allowed them under the following commission basis:

"On the first quarterly payment of premium, general agent will be permitted to take one hundred per cent.

"On the three remaining quarters of first year's premium, general agent will take 60 per cent.

"This method will equalize the regular commission of seventy per cent., and will not necessitate a refund to company in case of lapse, and the general agent can offer the same advance or less to his subagents, equalized to

any commission that he may contract to give, as per example:

60% basis would be............100% and 46 per cent.
55% basis would be...........100% and 40 per cent.
50% basis would be............100% and 33 per cent.

"Presuming you will desire to accept this proposition, we herewith enclose a slip to be attached to your contract; a copy of the same being attached to the agreement on file at the home office. Yours very truly, T. F. Giddings, General Superintendent of Agencies."

(9) "Detroit, Mich., August 19, 1904. G. L. Coleman, State Agent, Columbia, Tenn. — Dear Sir: We are pleased to inform you that we will allow sixty per cent. commission on policies in amounts of $5,000 and upwards written on the five-year renewal term plan on applications taken by you after August 31, 1904. On policies under $5,000 the commission will remain at fifty per cent.

"We trust that the increased commission will be an inducement for you to secure for the company a large increased business on this very popular form of life insurance.

"Please attach this letter to your contract and be governed by its contents as to the future business you may secure on the plan mentioned. Yours very truly, Michigan Mutual Life Insurance Co., by T. F. Giddings, G. S. of A.

(10) "It is hereby agreed between the Michigan Mutual Life Insurance Company and G. L. Coleman, gen-

eral agent, that, for the purpose of materially increasing the volume of the company's business within the territory mentioned in said agent's contract, the said company will allow said general agent a first year's commission of eighty-five per cent. on business secured and paid for written on the following named policy contracts of said company: Whole life — 20 annual payment life; 20 annual payment life option; 20-year endowment and longer periods; 10-year option. Participating — 20 annual payment life; 20-year endowment and longer periods.

"And in consideration of the increased commissions, and in accepting the proposition hereby made, the said general agent above mentioned hereby agrees with the said company that he will allow such agents now under contract with him, or such as may hereafter contract with him, seventy-five per cent. of first year's commission on any one of the above-named policy contracts written on applications secured by them.

"This agreement to begin April 1, 1904, and to cease December 31, 1905.

> "MICHIGAN MUTUAL LIFE INSURANCE CO.,
> "By T. F. GIDDINGS,
>
> "Genl. Supt. of Agencies.
> "G. L. COLEMAN, General Agent."

The parties continued to do business under this contract and its amendments until January, 1905. During nearly all of this time the defendant had local agents

and solicitors under him, but he had his headquarters at Columbia, Tennessee. During the month of December, 1904, it was agreed between the parties that Coleman should remove his headquarters to Nashville, Tennessee, and the removal took place on the 2d of January, 1905.

The court of chancery appeals finds that Coleman very largely increased the company's business within his field of operation during the time he acted as its general agent in this State.

That court further finds that the company knew that Coleman, during this series of years, was yielding to subagents the greater part of his interest in the first premium on each policy issued, and that he was doing this with a view to building up the business of the company, under the belief that he was thereby benefiting himself, by means of an estate which he would thus lay up for himself in the renewal premiums — that is, his interest therein; that the company had knowledge of this course of business, and of this purpose and understanding, and gave him encouragement thereon, leading him to believe that it sanctioned that view.

That court further finds that the cost of collecting renewal premiums does not exceed 1 per cent.

On the 26th day of January, 1905, the company discharged Coleman, and on the same day filed its bill against him, alleging therein that he was indebted to it in the sum of $1,300, consisting of renewal receipts sent

Insurance Co. v. Coleman.

to him for collection, or the proceeds thereof in his hands.

. On the 7th of March, 1905, Coleman filed his answer and cross bill, in which he admitted that he had in his hands $1,000 of the company's funds, but insisted that he had the right to retain this sum to partly cover a much larger indebtedness due from the company to him. He alleged that he had been wrongfully discharged, and that he was entitled to damages on two grounds: First, the value of his interest in the renewals on policies which had been issued on business procured by him; and, secondly, for the loss of current business under the last amendment to the contract above copied, from the date of his discharge to December 31, 1905.

The company filed its answer to the cross bill, in which it denied the indebtedness claimed against it, and that its discharge of the defendant was wrongful, alleging that it was justified in discharging him, because of his drunkenness and his failure to properly settle.

Coleman called for a jury, and issues were accordingly formulated. On the 25th of January, 1906, the jury brought in a verdict in favor of Coleman for $6,-000, less the sum above mentioned as having been retained by him.

The chancellor, on motion for a new trial made by the company, set aside the verdict on the ground that the weight of the evidence was against it on all the issues submitted. The defendant Coleman entered an exception to this action of the chancellor, and made up a way-

side bill of exceptions, preserving the evidence heard upon that trial.

In the month of October, 1906, the cause was again submitted to a jury on the following issues, viz.:

(1) "Did defendant Granville L. Coleman have a contract with the complainant, Michigan Mutual Life Insurance Company, commencing on April 1, 1904, and ceasing December 31, 1905?"

(2) "Did complainant, Michigan Mutual Life Insurance Company, breach this contract, dated April 1, 1904, by discharging him in January, 1905, and were they justified in so doing?"

(3) "If defendant Granville L. Coleman was discharged without legal cause, what amount of damages is he entitled to recover for this breach of said contract dated April, 1904, from the complainant, Michigan Mutual Life Insurance Company?"

(4) "Is defendant Granville L. Coleman entitled to recover renewal commissions which accrued after the year 1905? And, if so, to what damage is he entitled by reason of complainant's breach of its contract to pay same to him?"

The chancellor instructed the jury to return the following responses, viz.:

To the first issue, "Yes;" to the second, that the company was justifiable in discharging Coleman; to the third, that Coleman was not entitled to recover any damages; to the fourth, that he was not entitled to recover any renewal commissions.

A decree was accordingly rendered, adjudging the liability of Coleman for the money in his hands, and dismissing his cross bill.

From this decree an appeal was prayed to this court, and here the cause was referred to the court of chancery appeals, and that court, after finding the facts above referred to, and construing the contract and finding that the responses which the chancellor directed the jury to return were not sustained by the evidence, adjudged as matter of law that the chancellor was in error in giving a peremptory instruction upon the second, third, and fourth issues, and remanded the cause for a new trial upon the issues formulated.

That court, however, in order to meet the contingency of this court taking a different view of the materiality of the issues, went further, and made a finding of facts upon the amount of damages which they thought the defendant Coleman had suffered by reason of his wrongful discharge from the service of the company.

Both parties appealed from the judgment of the court of chancery appeals, and have assigned errors here.

The substance of the errors assigned by Coleman is that the chancellor acted erroneously in setting aside the first verdict, and the court of chancery appeals likewise committed error in failing to reverse the chancellor, and refusing to enter a judgment upon that verdict.

The company filed numerous assignments of error, but the greater part of these go to matters of fact which must be passed upon by the jury. The others may be

summarized under the following propositions, viz.: (1) That under a true construction of the contract the company had the power and right to discharge Coleman at its own discretion, and upon such discharge he lost all interest in the renewal premiums thereafter accruing; (2) that no recovery could be had in any event for commissions which Coleman might have earned between January 26, 1905, the date of the discharge, and December 31, 1905, the date fixed for the expiry of the last amendment to the contract, because the damages would be remote and speculative.

There was another defendant in the court below, W. G. McAdams, against whom the chancellor rendered a judgment for a part of the money of the company alleged to be in the hands of Coleman; but the court of chancery appeals reversed this judgment and dismissed the bill as to McAdams. No assignment of errors having been made upon this feature of the decree of the court of chancery appeals, no further notice need be taken of it herein.

W. D. COVINGTON, A. K. WILKINSON, and J. O. VOORHEIS, for Insurance Co.

H. H. COOK, P. M. ESTES, M. P. ESTES, and R. H. CROCKETT, for Coleman.

H. P. FIGUERS, for McAdams.

Insurance Co. v. Coleman.

MR. JUSTICE NEIL, after making the foregoing state-
ment of facts, delivered the opinion of the Court.

1.   The assignment of error filed by counsel for Mr.
Coleman on the action of the chancellor in setting aside
the first verdict is overruled.   The court of chancery
appeals found that the matters involved in that verdict
were fairly debatable on the evidence, and, the chancel-
lor having set aside the verdict on the ground that it
was not sustained by the evidence, the order upon that
subject cannot be disturbed here.   *Baugh v. Railroad,*
98 Tenn., 119, 121, 122, 38 S. W., 433.

2.   As to the construction of the contract:

It is observed upon a perusal of the original contract
that it does not in terms fix the duration of the agency.

Assuming that the company had by reason of this fact
the right to discharge its agent, Coleman, at pleasure,
without assigning any reason, rested upon his want
of faithfulness or efficiency, does it follow that he for-
feited his interest in the renewal premiums?   A solu-
tion of this question depends upon the nature of that
interest.   This must be determined from the contract
itself, with its amendments and the practical construc-
tion, afforded by the conduct of the parties in respect
thereof.   It will be perceived, upon an attentive examina-
tion of the contract and amendments, that, although
there is an indication here and there to the contrary,
the general agent's commission on first premiums and

his percentage on renewal premiums are both regarded in the light of compensation to him for his services in obtaining policies for the company and thereby building up its business. This is especially noticeable in the amendments or additions. In the second of these no distinction is made between the two kinds of commissions, except in the amount. Each is referred to as equally the right of the general agent. The same is true of the third amendment, and of the fourth, and of the seventh.

The general purpose is further evidenced by the requirement in the tenth amendment that Coleman shall allow to his subagents seventy-five per cent. of "first year's commissions." There is, indeed, a clause in the body of the original contract wherein the general agent's interest in the renewals is referred to as "a collection fee," and the same term is used in the sixth amendment; but this characterization is overborne by the terms of the other amendments already referred to, by the fact that the expense of collecting the renewal premiums was only one per cent., and by the course of dealing between the parties, their understanding of it, and their mutual treatment, as set forth in the statement, supra, to the effect that both parties understood that the general agent, in sacrificing the greater part of the first year's commissions to the subagents, was not only greatly augmenting the company's business, but was building up for himself an estate in the renewals. Under the terms of the contract the company can itself collect the renewal premiums, or require the general agent to col-

Insurance Co. v. Coleman.

lect them. In case he should collect them, his interest in the renewals should be sufficient to guarantee the service. He could claim no extra compensation. In case the company should itself collect the renewals, it was not contemplated that the general agent would thereby lose his interest therein.

The company would have no right, by a discharge of the agent arbitrarily and without cause, to forfeit and take to itself his earnings, stored up in the renewals. A forfeiture was provided for, under a discharge for cause, in the last paragraph of the original contract. This would, itself, under the rule, *"Expressio unius exclusio alterius,"* preclude a forfeiture on any other ground. There is, indeed, a provision in the contract that, upon the termination of the contract at any time, the company had the right "to transfer the business" of the agent to any person it may choose; but this by no means includes rights of property and interest in renewals already accrued, but merely the transfer of the agency. The forfeiture of rights is provided for only in the last paragraph, referred to, of the original contract.

So, the contract being without a provision for specific fault of the agent, such termination would not result in a forfeiture of his interest in the renewals, and he would be entitled to a judgment for the value thereof, to be ascertained through appropriate evidence.

We do not think the question arises as to whether defendant Coleman had an agency or power coupled with an interest, and we need not concern ourselves

with the inquiry whether the company could discharge
him because of such power or agency. He had an inter-
est, certainly, in the renewal premiums; but his power
to collect depended wholly upon whether the company
would place them in his hands for collection. It could
do so, but was not bound to do so; nor could its failure
or refusal in this regard deprive him of his interest. The
interest was his property, and the company held it for
him. He could lose it only under the grounds of for-
feiture contained in the contract, already adverted to.

Thus far, in discussing the contract, we have assumed
that it contained no provisions giving to the agency a
specific duration or limit of time. The court of chan-
cery appeals, however, as we understand their opinion,
hold that the tenth amendment to the contract extended
the whole contract to December 31, 1905. We do not
wish to descend into the particulars of the excellent
argument upon the subject contained in the opinion
of the court referred to. It suffices to say that we think
the conclusion reached is sound; but we do not think the
fundamental question in the case, concerning the inter-
est of Coleman in the renewal premiums, is at all af-
fected thereby, since the true inquiry arising is whether
he gave just cause for his discharge and thereby for-
feited the renewals.

In stating the foregoing conclusions, we have not
deemed it necessary to refer to, or quote from, the au-
thorities cited to us, because every such case must at
last turn upon the language of the contract under con-

struction, and the practical construction given thereto by the parties themselves, where there are facts available for the latter purpose. We have, however, examined the cases referred to, and others (*Phoenix Mut. L. Ins. Co.* v. *Holloway,* 51 Conn., 311, 50 Am. Rep., 21; *Lewis* v. *Atlas Mut. L. Ins. Co.,* 61 Mo., 534; *Newcomb* v. *Imperial Life Ins. Co.* [C. C.], 51 Fed., 725; *MacGregor* v. *Union Life Ins. Co.,* 121 Fed., 493, 57 C. C. A., 613; *Spaulding* v. *N. Y. Life Ins. Co.,* 61 Me., 329; *Frankel* v. *Mich. Mut. L. Ins. Co.,* 158 Ind., 304, 62 N. E., 703; *Mills* v. *Union Central Life Ins. Co.,* 77 Miss., 327, 28 South., 954, 78 Am. St. Rep., 522; *Burleson* v. *Northwestern Mut. Ins. Co.,* 86 Cal., 342, 24 Pac., 1064; *Park & Iverson* v. *Piedmont, etc., Ins. Co.,* 48 Ga., 601; *Stier* v. *Imperial Life Ins. Co.* [C. C.], 58 Fed., 843; *Jacobson* v. *Conn. Mut. L. Ins. Co.,* 61 Minn., 330, 63 N. W., 740; *Insurance Co.* v. *Williams,* 91 N. C., 69, 49 Am. Rep., 637; *Ballard* v. *Insurance Co.,* 119 N. C., 182, 25 S. E., 867; *Stagg* v. *Insurance Co.,* 77 U. S., 589, 19 L. Ed., 1038), some of which favor the conclusion we have reached, and some of which are adverse thereto, in a general way; but in each of them the contract commented upon and construed had in it something different from the controlling features which we have found in the contract before as in the present litigation.

3. We do not think that damages claimed for breach of the provisions contained in the last amendment to the contract are remote or too speculative for allowance. The kind of damages sustained, the loss of commissions,

was clearly within the contemplation  of the parties. They, therefore, cannot be treated as remote. They are not so speculative as that they cannot be ascertained. It can be shown, from the transactions of the agent who succeeded Coleman, what was accomplished by him between the date of Coleman's discharge and December 31, 1905, in respect of the class of contracts covered by the amendment referred to. This class of facts can be supplemented by evidence as to the efficiency, or the contrary, of Mr. Coleman as a general agent, and proper deductions may be made for the expenses that would be incurred in procuring policies of the kind referred to during the period mentioned. In this manner the amount of the original commissions, and his interest in renewals that would have arisen under the class of contracts above mentioned, and their value, can be estimated. The point is fully covered by the following authorities: *Wells* v. *Nat'l Life Ass'n of Hartford*, 39 C. C. A., 436, 99 Fed., 222, 53 L. R. A., 33, and note in latter volume on pages 76 and 77, and cases cited; *Dennis* v. *Maxfield*, 10 Allen (Mass.), 138; *Aetna Life Ins. Co.* v. *Nexsen*, 84 Ind., 347, 43 Am. Rep., 91; *Hitchcock* v. *Supreme Tent, etc.*, 100 Mich., 40, 58 N. W., 640, 43 Am. St. Rep., 423; *Lewis* v. *Atlas Mut. L. Ins. Co.*, supra; *Bagley* v. *Smith*, 10 N. Y., 489, 61 Am. Dec., 756; *Mueller* v. *Bethesda Mineral Spring Co.*, 88 Mich., 390, 50 N. W., 319; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y., 205, 4 N. E., 264, 54 Am. Rep., 676. And see

*Emerson* v. *Pacific Coast & N. Packing Co.* (Minn.), 104 N. W., 573, 1 L. R. A. (N. S.), 445.

We are of opinion that the decree of the court of chancery appeals was correct, reversing the action of the chancellor on the second, third, and fourth issues above copied. The decree of the court of chancery appeals, remanding the cause to the chancery court of Davidson county for trial on these issues and issue No. 1, is therefore affirmed.

There were certain issues filed by the defendant in the court below which were not acted on. It may be proper to say that the matter of those issues may be presented under the four issues above mentioned; that is, in determining whether Coleman was properly discharged by the company. The four issues which are copied above are really those which determine the controversy in its several branches, as is apparent from the discussion above appearing.

We affirm the decree of the court of chancery appeals, reversing the decree of the chancellor and remanding the cause for a new trial, as above indicated.

Coleman will pay so much of the costs of the appeal as are incident to bringing up for examination the first verdict. All of the other costs of the appeal will be paid by the complainant insurance company. The costs of the chancery court will be disposed of as may hereafter be decreed by the chancellor upon the final hearing of the cause.

The decree of the court of chancery appeals, dismissing the bill as to W. G. McAdams, is affirmed.