2000 SD 14

**Renee PARKER, Plaintiff and Appellee,**

v.

**WESTERN DAKOTA INSURORS, INC., a South Dakota Corporation, Defendant and Appellant.**

**No. 20682.**

Supreme Court of South Dakota.

Argued April 27, 1999.

Decided Feb. 2, 2000.

Michael P. Reynolds of Quinn, Day & Barker, Rapid City, for plaintiff and appellee.

J. Crisman Palmer of Gunderson, Palmer, Goodsell & Nelson and Roger W. Damgaard and Melanie L. Carpenter of Woods, Fuller, Shultz & Smith, Rapid City, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Western Dakota Insurors, Inc., an insurance agency, appeals a decision requiring it to pay a percentage of commissions that First American Systems, Inc., another insurance agency, agreed to pay its employee, Renee Parker. The circuit court reasoned that because Western Dakota purchased First American's income generating assets, including its "book of insurance business," it thereby incurred the obligation to honor First American's contract with its employee. We reverse that ruling because Western Dakota's purchase excluded assumption of First American's liabilities. We affirm the order denying Parker's claim for unjust enrichment.

### Facts

[¶ 2.] Renee Parker was employed as a salaried insurance sales agent and manager with First American Systems from June 1982 to December 1992. In 1988, the president and principal owner of First American, Tom Lane, made known his plans to retire. Parker expressed concern to Lane about her future. If he sold the company's

insurance business, the new owner would acquire all future renewal commissions, and the income from the clients Parker had helped to build and nurture would be lost. To induce Parker to remain with First American, and to bind her not to compete with the company should she later choose to leave, Lane agreed on behalf of First American to pay her a percentage of the commissions the company received after her employment ended. On June 2, 1988, they executed a written agreement in which they "set forth in writing their respective rights, duties, responsibilities and entitlements." The agreement stated in part:

(3) Upon termination of her employment with [First American] ... she shall be entitled to that percentage as hereinafter set forth of renewal commissions received by [First American] for all products sold, serviced and handled by a producer during the term of this agreement for so long as [First American] renews such insurance with the same insurance carrier or company. Parker's percentage for such renewal commissions received by [First American] shall be fifty percent (50%) for all group health and fifty-six point two five percent (56.25%) for all other products of insurance. Parker's entitlements hereunder, if any, shall be paid monthly commencing upon termination of her employment....

* * *

(6) Parker expressly agrees and states that any and all insurance business at any time or times secured by [Parker] while contracted by [First American], or during the term of this Agreement, is and shall be the permanent and exclusive property of [First American], and that all records relating to its business, including without limitation financial information, personnel information, lists of customers and accounts, sales information, renewal and expiration dates, and use and control of expirations of all insurance business,

shall be and remain the absolute and sole property of [First American]....

* * *

(10) This Agreement shall inure to the benefit of and shall be binding upon [First American], its successors and assigns, including without limitation any person, partnership, or corporation which may [acquire] all or substantially all of [First American's] assets and business or unto which [First American] may be consolidated or merged. It is further agreed that this Agreement is, however, personal unto Parker and shall not be assignable by Parker....

[¶ 3.] In October 1988, Lane sold First American to E.J. Smith and First American Holding Company. In 1992, the new owners informed the company's insurance agents their commissions were to be substantially decreased and new commission agreements would need to be signed. Parker's percentage of renewals under her agreement would thus be reduced. Not wanting to give up her contract rights, she elected to resign in December 1992. In 1993, First American paid her in accord with paragraph three of her contract. When, in 1994, Parker learned that First American was about to be sold again, this time to a competing agency, Western Dakota, she spoke with its president, Gary Larson. She asked him if he was aware that she had a contract with First American. Larson responded that Western Dakota was "not interested in the obligations" of First American and that if a purchase took place, it would be of the "books of business and selected assets."

[¶ 4.] In May 1994, Western Dakota purchased substantially all First American's income generating assets. These assets consisted of "all client or customer lists, including expiration and renewal dates, customer data, all insurance dailies and all records and information with respect thereto, files and right to renewal commissions." Based on a formula, the purchase price was fixed to a percentage of "the

commissions from the renewals of the business being purchased," to be paid as received over a period of years. No stock transfers took place as part of the purchase agreement, and no director or shareholder of First American was made a director or shareholder in Western Dakota. The purchase contract specifically excluded "any of [First American's] debts or accounts payable and other liabilities." Western Dakota paid First American $100,000 in advance to be applied toward the percentage of commissions it would pay in the future.

[¶ 5.] Although Parker's agreement entitled her to a portion of First American's commissions, First American never shared with her any part of Western Dakota's payments. Neither did Western Dakota make any payments to her, even after she demanded that it honor her contract. Following the sale to Western Dakota, First American filed for Chapter 7 bankruptcy and ceased business operations. Travelers Indemnity Company, as a secured creditor, took control of the remaining assets and sold them, accumulating approximately $1.3 million to pay over $2 million in liabilities.

[¶ 6.] Parker sued Western Dakota for breach of contract, conversion, and unjust enrichment. The circuit court reviewed the First American–Western Dakota agreement, found it unambiguous, and ruled that, as a matter of law, Western Dakota became obligated to Parker because it "purchased" Parker's contract with First American. Consequently, the court granted judgment to Parker on her claim for breach of contract. With liability issues decided, the only question remaining was the amount of damages. The parties agreed to waive a jury trial and to try the damage issue to the court. In its judgment, the court ruled that Western Dakota owed Parker $34,102 in back compensation. Moreover, in accord with the Parker Agreement, Western Dakota was also ordered to pay monthly Parker's percentage of commissions received.

[¶ 7.] Western Dakota appeals, raising eleven separate legal issues. We consider the following two questions dispositive: (1) Did Western Dakota expressly or impliedly purchase or assume the Parker Agreement when it entered into the purchase agreement with First American? (2) Was Western Dakota entitled to dismissal of Parker's unjust enrichment claim as a matter of law? Our review is de novo as contract interpretation is a question of law. *Olsen v. Airheart,* 531 N.W.2d 571, 572 (S.D.1995).

## Analysis and Decision

### 1. Assumption of the Parker Agreement

[¶ 8.] Western Dakota's asset purchase did not list or include by reference the Parker Agreement. Indeed, the purchase agreement specifically excluded First American's liabilities. Nonetheless, Parker argues that by purchasing the right to renewal commissions, Western Dakota either expressly or impliedly assumed the terms and conditions of the Parker Agreement.

[¶ 9.] A contract obligation is ordinarily due only to those with whom it is made, and generally corporations purchasing assets of other corporations will not be subject to the sellers' liabilities. *Hamaker v. Kenwel–Jackson Mach., Inc.,* 387 N.W.2d 515, 518 (S.D.1986) (citing *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 439 (7th Cir.1977); *Downtowner, Inc. v. Acrometal Prod. Inc.,* 347 N.W.2d 118, 121 (N.D.1984)). Nonetheless, courts finding certain linkages between a seller and buyer corporation will in some instances conclude that an asset purchase carries with it liabilities attendant with those assets. Four exceptions have developed to create successor liability:

(1) when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability;

(2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations;

(3) when the purchaser corporation is merely a continuation of the seller corporation; or

(4) when the transaction is entered into fraudulently to escape liability for such obligations.

*Id.* (citing *Jones v. Johnson Mach. & Press Co.,* 211 Neb. 724, 320 N.W.2d 481, 483 (1982)). Here, we examine only the first exception as that is the one Parker believes pertains to Western Dakota. All these exceptions, we caution to explain, evolved under the traditional rules applicable to corporate law. They have, however, undergone some expansion under the law of products liability. Strict liability in tort for defective products applies regardless of negligence or privity. Liability for defective products rests on the need to compensate eligible plaintiffs; thus, the burden of economic loss is shifted not just to the manufacturer of the defective product, but also at times to the successor manufacturer who by purchasing assets from the predecessor is able to continue making the same or similar products. Yet, these strict liability concepts created for the protection of injured persons do not have the same expansive application in a purely contractual dispute. In this case, we deal only with the interpretation of contracts to decide whether by purchasing assets Western Dakota became responsible for First American's liability to its employee.

■ [¶ 10.] Respecting assets and liabilities, the purchase agreement between Western Dakota and First American provides:

The assets being purchased means and includes all client or customer lists, including expiration and renewal dates, customer data, all insurance dailies and all records and information with respect thereto, files and right to renewal commissions (the "Business").

\* \* \*

The Seller shall sell to the Buyer, free and clear of liens and encumbrances, the Business. However, it is expressly understood and agreed that Buyer is not purchasing cash on hand, receivables, nor has buyer agreed to assume any of Seller's debts or accounts payable and other liabilities.

This language is clear and unambiguous. The agreement expressly excluded any assumption of First American's debts and liabilities. "An unambiguous contract between the seller and purchaser corporations, with explicit provisions which exclude any liability for the debts and liabilities of the predecessor, weighs against ... finding that an exception can be implied." *Florom v. Elliott Mfg.,* 867 F.2d 570, 575 (10th Cir.), *reh'g denied,* 879 F.2d 801 (1989). This purchase was apparently made in good faith and for valid consideration. Western Dakota claims to have paid over $400,000 for First American's assets.

■ [¶ 11.] "A buyer of assets can avoid the implied assumption of liabilities by enumerating liabilities assumed and explicitly excluding the assumption of liabilities not enumerated." *Philadelphia Elec. Co. v. Hercules, Inc.,* 587 F.Supp. 144, 148 (E.D.Pa.1984), *rev'd on other grounds,* 762 F.2d 303 (3rd Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). Here, Western Dakota expressly disclaimed responsibility for any First American liability. Although it may have had actual knowledge of the agreement between First American and Parker, that is not enough to show that it assumed the obligations under the Parker Agreement. In fact, Parker's argument that Western Dakota had previous knowledge of the Parker Agreement only supports Western Dakota's position. It, with knowledge of the Parker Agreement, expressly eliminated responsibility for any of First American's debts or obligations.

■ [¶ 12.] On the other hand, Parker's agreement with First American provided that it "shall inure to the benefit of and

shall be binding upon [First American], its successors and assigns, including without limitation any person, partnership, or corporation which may [acquire] all or substantially all of [First American's] assets and business[.]" Western Dakota was not privy to the Parker Agreement. That contract cannot unilaterally bind a noncontracting party. Parker's agreement with First American was essentially an employment contract. Western Dakota never employed her and never promised that it would honor First American's contractual duties to its employees.

[¶ 13.] In *Shaw v. Republic Drill Corp.*, 810 F.2d 149 (7th Cir.1987), Shaw sought damages for breach of his employment contract, not from his former employer, but from the corporation that bought substantially all the assets from his former employer. He based his theory of recovery on a provision in his employment contract that stated "in the event that Employer shall sell all or substantially all of [its] assets . . . this [a]greement shall be binding upon any such successors." *Id.* at 150 (alterations in original). Applying Illinois law, the court wrote, "the general rule is that a corporation purchasing the assets of another corporation does not assume the liabilities of the selling corporation." *Id.* Illinois, like South Dakota, recognizes four exceptions, but none applied in Shaw's case. The court concluded, "Shaw does not refer us to any Illinois cases to support his claim that this provision can be enforced against the purchasing corporation." *Id.*

[¶ 14.] Parker argues that Western Dakota impliedly assumed First American's liabilities under the Parker Agreement when it purchased First American's insurance business and the rights to renewal commissions. The conduct and representations of parties to a transaction may suggest intent by the acquiring company to assume the liabilities of the selling corporation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7124 (perm. ed.1999). One of many valid considerations in deciding the existence of an implied assumption of liabilities is an instance "where a corporation purchases the property and franchises of another company, including property for which the latter was under an obligation to pay and to which it could acquire no right without payment. In that case the purchasing company impliedly assumes the obligation." *Id.* Here, however, Western Dakota legally acquired the rights to the renewal commissions and paid valuable consideration for them.

[¶ 15.] We fail to see how a purchase of a right to First American's renewal commissions becomes, in effect, a legal assumption of First American's promise to share a percentage of its commissions with Parker. Parker had no title or ownership interest in First American's insurance business or renewal commissions. Her agreement with First American stated that "all insurance business at any time or times secured by [Parker] . . . shall be the permanent and exclusive property of First American[.]" She agreed that "all records relating to its business, including without limitation financial information, personnel information, lists of customers and accounts, sales information, renewal and expiration dates, and use and control of expirations of all insurance business, shall be and remain the absolute and sole property of [First American]." Thus, she had only an unsecured promise from First American to pay her a percentage of its commissions. *See, e.g., Stockmen's Ins. Agency, Inc. v. Guarantee Reserve Life Ins. Co.*, 217 N.W.2d 455, 460 (N.D.1974) (an insurance agent's right to commissions on renewal premiums depends on the existence of an employment contract expressly and specifically providing for such); *Cox v. Ohio Nat'l Life Ins. Co.*, 250 Or. 7, 438 P.2d 998, 1000 (1968) ("It is a general rule that a life insurance agent has no right to renewal commissions after termination of his agency, except as his contract with the company provides for them."). Perhaps if Parker had obtained a UCC lien on the

commissions, she would not be in her present position. *Bigbie v. Bigbie,* 898 P.2d 1271, 1273 (Okla.1995)(renewal commissions "analogous" to account receivables). But no one argues that the Uniform Commercial Code applies to this case, so the question is not before us.

[¶ 16.] First American sold to Western Dakota what it expressly retained as its property in the Parker Agreement. It sold its right to receive renewal commissions. When it did so without arranging for Parker's percentage to those commissions, it broke its agreement with Parker in failing to honor its promise by arranging for a portion of the payments it received from Western Dakota to go to her. Western Dakota, however, cannot be held responsible for First American's breach of contract, for to do so would effectively require Western Dakota to pay twice for the same asset. We conclude that the court erred in deciding that Western Dakota was obligated to Parker under the terms of the Parker Agreement when it acquired First American's assets. Accordingly, the judgment of the trial court is reversed.

## 2. Unjust Enrichment

[¶ 17.] If Parker has no contractual right to the renewal commissions that First American sold to Western Dakota, does she have an actionable claim for unjust enrichment against Western Dakota? The trial court found for Western Dakota on this question, but only because the court thought it unnecessary to reach the issue as it had ruled in favor of Parker on the breach of contract claim. We recently examined the elements of unjust

enrichment in *Juttelstad v. Juttelstad,* 1998 SD 121, 587 N.W.2d 447. Unjust enrichment occurs when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying. *Id.* ¶ 19, 587 N.W.2d at 451 (quoting *Sporleder v. Van Liere,* 1997 SD 110, ¶ 16, 569 N.W.2d 8, 12 (citations omitted)). To prove unjust enrichment, Parker must show she conferred a benefit on Western Dakota, Western Dakota was aware of the benefit, and to allow it to retain that benefit without reimbursement would unjustly enrich it. *Id.; see Bollinger v. Eldredge,* 524 N.W.2d 118, 123 (S.D.1994). "Enrichment is unjust if it is a result of money paid by mistake." *Juttelstad,* 1998 SD 121, ¶ 22, 587 N.W.2d at 452 (quoting *Talley v. Talley,* 1997 SD 88, ¶ 33, 566 N.W.2d 846, 853 (citation omitted)).

[¶ 18.] Here, Parker cannot make out a claim for unjust enrichment. It is true that Western Dakota received a benefit, but Western Dakota paid for it. First American conferred the benefit, which it had a right to do, even by the terms of the Parker Agreement. First American expressly retained all rights to the control and ownership of the insurance book and renewal commissions, including those mentioned in the Parker Agreement, and it sold those rights to Western Dakota. Western Dakota knew of Parker's claim to the renewal commissions, but the language in its purchase agreement specifically excluded assumption of any of First American's liabilities.

[¶ 19.] Affirmed in part, reversed in part, and remanded with directions to enter judgment for Western Dakota.[1]

---

1. Ordinarily, a direct response to a dissent is unnecessary as readers may judge for themselves which analysis ought to prevail. However, this is a compelling case—one naturally sympathizes with Renae Parker's unfortunate situation. She thought she had contracted for post-retirement benefits with the former owner of First American. Later she discovered that when First American sold its assets and went out of business, her contracted for bene-

fits would not be honored by the company that bought the assets. Yet it is precisely because this case pulls at our sympathies that we must not allow sentiment to color our view of the facts or to lure us into misapplying the law. The sale of business assets of all kinds is a common transaction in South Dakota and established rules govern those transactions. Equally established are the principles applicable to the rare circumstance when

[¶ 20.] MILLER, Chief Justice, and SABERS and AMUNDSON, Justices, concur.

[¶ 21.] GILBERTSON, Justice, dissents.

a corporate liability will follow an unsecured asset.

The authorities the dissent cites have nothing to do with the facts before us. The dissent refers to cases in which insurance agents with contracts with insurance companies were held to have a vested right in their renewal commissions. One such case is *Cockrell v. Grimes*, 740 P.2d 746 (Okla.Ct.App 1987), where the court held that the agent was entitled to commissions on policies he wrote and renewal commissions were payable to him as long as the premiums continued to be paid. In *Cockrell*, the agent had a "written agency contract" with United Equity Life Insurance Company, which provided that "all first year and renewal commissions on policies written by Cockrell, were considered vested in him and payable to him so long as the premiums continued to be paid." *Id.* at 747. Another cite is to a 1907 Tennessee case for the dissent's proposition that an agent's right to renewal commissions is a property right. *Michigan Mut. Life Ins. Co. v. Coleman*, 118 Tenn. 215, 100 S.W. 122, 127 (1907). *Coleman* was a case involving an insurance agent's direct contract for commissions with the insurance company for whom he sold insurance. Those are not the facts in this case.

Parker's contract with First American provided just the opposite of what the agents in the dissent's cases bargained for. In addition to providing that she was a salaried employee, her agreement stated in relevant part: "Parker expressly agrees and states that any and all insurance business at any time or times secured by [Parker] while contracted by [First American], or during the term of this Agreement, is and shall be the permanent and exclusive property of [First American]." Parker's agreement entitled her to a *percentage* of certain "renewal commissions *received* by" First American. (Emphasis added.) If Parker had rights equivalent to the rights of the agents in the cases the dissent cites, she would not have had to bother with Western Dakota. She could claim her commissions directly from the insurance companies whose policies she sold.

As a last example, the dissent quotes from *Eagle Pacific Insurance Co. v. Christensen Motor Yacht Corp.*, 135 Wash.2d 894, 959 P.2d 1052 (1998). It cites this case for the rule that purchasing companies receive the same protection accorded any buyer: "the bona fide purchaser who gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims." *Id.* at 1055 (quoting *Hall v. Armstrong Cork, Inc.*, 103 Wash.2d 258, 692

P.2d 787, 790 (1984)). As general tenets go, this is fine. But quoting this principle only illustrates the danger of taking a general proposition out of the factual and legal setting in which it was applied. *Eagle Pacific* involved a yacht builder who, when his company verged on financial ruin, created a new company and transferred all its yacht building contracts to the new company for the specific purpose of escaping the old company's creditors. From the same four exceptions under the corporate successor liability doctrine that South Dakota recognizes, the Washington Supreme Court applied the fourth exception: fraudulent transfer. The only exception requiring consideration here is the first exception: purchasing corporation expressly or impliedly agreed to assume selling corporation's liabilities. We ruled that exception inapplicable here.

When President Tom Lane sold the "business," and Parker later retired, she received her share of renewal commissions from the new owner. But under the new owner, First American, on the verge of bankruptcy, sold its "assets," including its rights to renewal commissions to Western Dakota. In doing so, First American broke its contract with Parker by not providing for her interests. But First American's liability is not in issue here. The question for us is whether in purchasing First American's assets Western Dakota explicitly or implicitly also purchased First American's liabilities. Under the established tests for deciding successor liability, the answer must be no.

Notably absent from the dissent's writing is a cite to any authority that holds that a private agreement between an employer and an employee to share future receipts binds a later purchaser of the corporate employer's assets. The dissent faults our authority directly on point, but still comes up with no better rationale than that we are our state's highest court so we are not limited to the four exceptions the Illinois courts recognize. But those are the same exceptions we recognize. What the dissent is in essence suggesting is that even though the agents at Western Dakota paid valuable consideration to First American, the owner of the insurance contracts, they should again dig into their pockets and pay Parker for those assets. The renewal commissions were unquestionably First American's assets. It promised to share them with Parker, but then, quite unfairly, it sold them all to Western Dakota. If First American were still a viable business Parker would have a clear case against it, but she has no case against Western Dakota.

[¶ 22.] SABERS, Justice, had deemed himself disqualified, and all parties and counsel waived said disqualification.

GILBERTSON, Justice (dissenting).

### Parker's Contract Claim

[¶ 23.] The Court concludes Western Dakota was not bound by the Parker Agreement. It also states Western Dakota expressly eliminated responsibility for any of First American's debts or obligations. Essentially, the Court's opinion concludes Parker is without legal recourse because when First American sold its right to receive renewal commissions to Western Dakota, First American was the one who broke its promise to Parker, not Western Dakota. I respectfully disagree with the Court's opinion.

[¶ 24.] Paragraph ten of the Parker Agreement specifies it will be binding upon any party acquiring all or substantially all of First American's assets and business. On May 11, 1994 Western Dakota did subsequently purchase substantially all of First American's then existing insurance business. In its purchase of First American's assets, Western Dakota assumed the terms and conditions of the Parker Agreement:

> The assets being purchased means and includes all client or customer lists, including expiration and renewal dates, customer data, all insurance dailies and all records and information with respect thereto, files and *right to renewal commissions,* (the "Business"). (emphasis added).

The Court's opinion concludes Western Dakota's purchase of the right to First American's renewal commissions did not equal a legal assumption of First American's promise to share a percentage of its commissions with Parker. The Court's opinion states "Parker had no title or ownership interest in First American's insurance business or renewal commissions."

The Parker agreement states that the "insurance business" developed by Parker "shall be the permanent and exclusive property of [First American] ...," and that the "insurance business" was purchased by Western Dakota. Parker has never denied this. However, the Parker Agreement specifically states Parker is entitled to a percentage of the *commissions* she develops with respect to the business. Therefore, even though the insurance business was sold by First American and bought by Western Dakota, the applicable percentage of the renewal commissions was by contract previously promised to Parker, as the Parker Agreement specifies. In fact, both Parker and Tom Lane, the negotiator and signatory of the Parker Agreement for First American, testified the very purpose of the Parker Agreement was to protect Parker's entitlement to her percentage of the renewal commissions. Lane testified:

Q: Could you tell me, please, to the best of your ability, what the purpose of Paragraph 10 was in your mind.

A: (Lane) Well, to I guess to remove [Parker's] concern that if we sold to somebody this would all go away and it was to continue on. That, I know, was a real concern of hers at the time. She knew and trusted us, she didn't know who else would be there, that type of thing.

Q: Okay. Was it your intention based on this paragraph then if the agency were sold, i.e., all or substantially all of [First American's] assets and business, then [Parker's] contract would continue on with the company that purchased those assets?

A: Yes, yes.

Moreover, the Parker Agreement states ".... Parker shall *be entitled to that percentage hereinafter set forth of renewal commissions received by [First American] for all products sold serviced and handled by her during the term of this Agreement ...*" (emphasis added). Further, the Agreement states "Parker's *entitlements*

hereunder, if any, shall be paid monthly commencing upon termination of her employment...." It specifically addressed the issue now before us with this clause:

> This Agreement shall inure to the benefit of and shall be binding upon [First American], its successors and assigns, including without limitation any person, partnership, or corporation which may require [sic] all or substantially all of [First American's] assets and business[.]

The trial court correctly found as fact that Western Dakota knew of the existence of the Parker Agreement before it entered into the purchase agreement.

[¶ 25.] When Western Dakota purchased First American's assets, it received only those rights to renewal commissions First American could sell. A buyer receives no better title than the seller can provide. In *Michigan Mut. Life Ins. Co. v. Coleman*, 118 Tenn. 215, 100 S.W. 122, 127 (1907), the court stated: "[t]here is indeed, a provision in the contract that, upon the termination of the contract at any time, the company had the right 'to transfer the business' of the agent to any person it may choose; but this by no means includes rights of property and interest in renewals already accrued, but merely the transfer of the agency." First American did not have the exclusive right to all renewal commissions. Pursuant to the Parker Agreement, First American agreed to pay Parker, upon termination of her employment, 50% for group health and 56.25% or all other products of insurance in renewal commissions. Thus, the trial court was correct in its finding that "the 'right to renewal commissions' referenced in the 1994 purchase agreement was subject to the rights of Parker to her renewal commissions set forth in the Parker Agreement made prior to the asset purchase."

[¶ 26.] The Court is correct when it states the general rule is that a corporation purchasing the assets of another corporation will not be subject to the liabilities of the seller, and that four exceptions have developed to the rule. *Hamaker v. Kenwel–Jackson Mach., Inc.*, 387 N.W.2d 515, 518 (S.D.1986) (citing *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir.1977)). However, the basis for this traditional corporate law doctrine is that "a sale of corporate assets transfers an interest separable from the corporate entity and does not result in a transfer of unbargained-for liabilities from the seller to the purchaser." *Hall v. Armstrong Cork, Inc.*, 103 Wash.2d 258, 692 P.2d 787, 790 (1984). The rationale for this rule is that a purchasing corporation should receive the same protection traditionally given to any purchaser of property. *Id.* Thus, "the bona fide purchaser who gives adequate consideration and *who lacks notice of prior claims against the property* acquires no liability for those claims."[2] *Eagle Pacific Insurance Co. v. Christensen Motor Yacht Corp.*, 135 Wash.2d 894, 959 P.2d 1052, 1055 (1998) (citing *Hall*, 692 P.2d at 790) (emphasis added). Western Dakota, while it did pay consideration for First American's assets, had actual notice of the Parker Agreement before the purchase was complete. Thus, Western Dakota knew Parker had a claim against a certain percentage of renewal commissions, and when it purchased the "right to renewal commissions" of First American, it also purchased the Parker Agreement. Western Dakota has been receiving the

2. The Court criticizes this dissent for relying on *Eagle Pacific.* That case involves the fourth exception that does not apply to this case. *Eagle Pacific* does adhere, however, to the rule upon which the Court relies, "[n]ormally, when a corporation sells its assets to another corporation, the purchasing corporation does not become liable for the debts of the selling corporation." 959 P.2d at 1055; *see also Hamaker*, 387 N.W.2d at 518. This case was cited purely to explain the rationale behind this rule. Certainly it aids the reader in understanding this explicit rule of corporate law. It is an explicit rule because it is good public policy to protect those purchasing corporations that have no knowledge of any prior claims against property of the selling corporation. However, those purchasing corporations *with* knowledge of prior claims should not be granted such protection.

benefits of renewal commissions procured by Parker, and it should only follow that it should also accept the burdens running with them.

[¶ 27.] The right of an insurance agent to his renewal commissions has been recognized as a substantial property right.[3] *Cockrell v. Grimes,* 740 P.2d 746, 748 (Okla.App.1987); *General American Life Ins. Co. v. Roach,* 179 Okla. 301, 65 P.2d 458, 460 (1937); *Coleman,* 100 S.W. at 127; *Schrimplin v. Farmers' Life Ass'n.,* 123 Iowa 102, 98 N.W. 613, 617 (1904); *Hercules Mutual Life Assurance v. Brinker,* 77 N.Y. 435, 1879 WL 10724, at *6 (1879). *See* also *People ex rel. Palmer v. Peoria Life Ins. Co.,* 376 Ill. 517, 34 N.E.2d 829, 833-34 (1941) (Wilson, J., dissenting) ("An agent does not lose his right to renewal commissions . . . by receivership of the issuing company or the transfer of its policies to a successor company."); 4 Couch on Ins. § 57:44 (3d ed) ("The successor to the original insurer may be bound to continue to pay renewal premiums to agents of the original insurer."). "The agent's right to a percentage of the premium on a policy is a property right which becomes fixed as soon as the policy is taken out, and then is realized when the premiums are actually paid from time to time." *Cockrell,* 740 P.2d at 749 (citing *Wear v. Farmers & Merchants Bank,* 605 P.2d 27, 30 (Alaska 1980)). Similarly here, Parker's contract with First American authorized by SDCL 58–30–86, provided that Parker was enti-

tled to renewal commissions in the amount of 50% for group health policies and 56.25% for all other insurance policies "sold, serviced and handled by her," and that the commissions were payable to her for each year in which the policies "were thereafter renewed with First American in the same insurance company or carrier." Indeed, it has been held that "[t]he right of an agent to commissions on renewal premiums is determined by the terms of his contract of employment." *Wagner v. Land,* 152 Okla. 225, 4 P.2d 81, 84 (1931). In this case, the contract of employment provides Parker was to receive commissions on renewal premiums even after termination of the employment contract and the sale of assets by First American, as long as the premiums were paid to its successor. *Cockrell,* 740 P.2d at 748. The principle stated by the court in *Cockrell* applies to this case:

> Under *Roach* that portion of the premiums collected which constitutes Cockrell's commissions are not assets of the insolvent insurer, but are the vested property of Cockrell, and are held in trust for him. As long as the insurance policies written by Cockrell are in effect and premiums are being paid on those policies, the commissions on those premiums is the separate, vested property of Cockrell and not the assets of the insolvent insurer.

*Id.*

[¶ 28.] In conclusion, this type of a contract was specifically authorized by SDCL 58–

---

**3.** An insurance agent's right to receive a commission from an insurance company is based upon a contract. Parker was an insurance "agent" as defined by SDCL 58–30–1 as she was licensed by the Director of the Division of Insurance. However, her "right" as an agent to solicit and sell insurance contracts that are relevant to this suit does not flow directly between her and the insurance company. She worked as an employee in various capacities for her employer, First American, who was also an "agent" within the definition of SDCL 58–30–1. Her right to payment when the commissions were received by her employer on insurance she sold, was also based upon contract. Therefore, the above-cited cases are authority for the premise that con-

tractual obligations to pay a portion of an insurance commission to Parker are an enforceable property right based on contract. SDCL 58–30–86 specifically recognizes the legality of these types of contracts as long as both contract parties are agents:

> No agent or soliciting agent may directly or indirectly share his commissions or other compensation received or to be received by him on account of a transaction under his license with any person not also licensed under this chapter as to the same kind or kinds of insurance involved in such transactions. Violation of this section is a Class 2 misdemeanor.

> As such these cases are persuasive authority for Parker's position.

30–86. The contract stated that Parker's rights were to continue even if the policies she sold were assigned by First American to another. Western Dakota knew of the contract when it purchased First American's assets. When it purchased First American's assets, Western Dakota bound itself to the Parker Agreement.[4] As such I would affirm the trial court on this issue.

### Parker's Unjust Enrichment Claim

[¶ 29.] Parker sought recovery in the alternative on the basis of unjust enrichment. The sole reason Western Dakota prevailed on this claim is because the trial court had already granted relief upon Parker's contract claim. For Parker to prevail on a claim of unjust enrichment she must establish: (1) Western Dakota has received a benefit, (2) Western Dakota is cognizant of the benefit; and (3) the retention of the benefit without reimbursing Parker would unjustly enrich it. *Juttelstad v. Juttelstad*, 1998 SD 121, ¶ 19, 587 N.W.2d 447, 451 (citing *Bollinger v. Eldredge*, 524 N.W.2d 118, 123 (S.D.1994)). Western Dakota received a benefit as it is receiving commissions from insurance policies, which had been sold by Parker pursuant to the Parker Agreement. When Western Dakota purchased the assets of First American, it knew of the Parker Agreement. Parker had sold these policies in lieu of working for a competitor and to now allow Western Dakota to retain the full 100% of the commission (in comparison to 50% and 43.75% retained by First American) for policies it had no part in selling is unjust enrichment.[5]

### Conversion

[¶ 30.] "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the

4. The Majority faults the dissent for "failure to cite any authority that holds that a private agreement between an employer and an employee to share future receipts, is binding on a later purchaser of the corporate employer's assets." The majority should hold itself to the same standard as it has no persuasive authority to the contrary. Its sole "authority" is *Shaw v. Republic Drill Corp.*, 810 F.2d 149 (7th Cir.1987) wherein the federal court in a two paragraph opinion refused to uphold an employee's contractual claim because the employee failed to cite any Illinois cases which supported his position and the federal court felt it improper to speculate how the Illinois courts would decide the issue. *Shaw's* holding is simply "[w]e write only to emphasize that our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court." *Id.* at 150.

As the highest appellate court in South Dakota we are not bound by such a limitation. What we are bound by is our long-standing rule of appellate review that we will not seek reasons to reverse but rather will affirm a trial court if there is a basis to do so. *See Boland v. City of Rapid City*, 315 N.W.2d 496, 499 (S.D.1982) ("A trial court's rulings and decisions are presumed to be correct and this court will not seek reasons to reverse."). In other words, it is the obligation of Western Dakota to show why the trial court erred, not the obligation of Parker to show why the trial court was correct. *See Crook v. Pap*, 303 N.W.2d 818, 819 (S.D.1981) *per curiam* (citing *Custer County Bd. of Ed. v. State Commission on Elementary and Secondary Ed.*, 86 S.D. 215, 193 N.W.2d 586 (1972) (burden is on the party alleging error to show it affirmatively by the record, thus, error may not be presumed on appeal)).

5. The Court declares no unjust enrichment can exist because, "[i]t is true that Western Dakota received a benefit, but Western Dakota paid for it." This begs the question as it does not conclude Western Dakota paid the fair market value for the right to the commissions with no discount for the Parker obligations. The trial court made no finding that Western Dakota paid a nondiscounted fair market value despite the fact Western Dakota repeatedly sought it. It did not accept this contention of Western Dakota. Instead it held, "by virtue of the unambiguous language found in May 11, 1994 Purchase Agreement, Western Dakota purchased the contract between [Parker] and First American systems." The trial court did state in its findings, "[l]eft for trial, then, was the issue of damages and Plaintiff's equitable unjust enrichment claim. The parties agreed to waive jury trial on those remaining issues, and said issues were tried before the Court on April 7, 1998. The Court was able to judge the credibility of the witnesses and weigh the evidence accordingly." Thus any claim by Western Dakota of full payment failed.

owner's right in the property or in a manner that is inconsistent with such right." *Rushmore State Bank v. Kurylas, Inc.,* 424 N.W.2d 649, 659 (S.D.1988). The definition of "property interests should be liberally, rather than strictly, construed." *Id.* at 652, (citing *Carlson v. Hudson,* 277 N.W.2d 715, 719 (S.D.1979)). Here also the trial court granted a verdict to Western Dakota solely because it had previously ruled for Parker on the contract claim.

[¶ 31.] When Western Dakota received renewal premiums on policies of insurance written by Parker, a former employee and manager of First American, a constructive trust was created, and Western Dakota became a trustee for Parker to the extent of her renewal commission interest in such premiums. *See Palmer,* 34 N.E.2d at 834 (Wilson, J., dissenting). One who wrongfully detains a thing of value by breach of contract, unjust enrichment or conversion is an implied trustee for the benefit of the owner. SDCL 55-1-7. One who gains a thing of value by a wrongful act, unless he has some other and better right thereto, holds the item as an implied trustee for the benefit of the person who would otherwise have had it. SDCL 55-1-8; *Rosebud Sioux Tribe v. Strain,* 432 N.W.2d 259, 264 (S.D.1988). If the renewal commissions are not paid to Parker, Western Dakota will "receive a windfall contrary to the familiar principle that equity will not tolerate an unjust enrichment." *Palmer,* 34 N.E.2d at 834.

[¶ 32.] Parker's commissions vested upon payment of commissions paid by the insurance company to the party entitled to receive them, be it First American or Western Dakota. The money earned by Parker is her property, not that of Western Dakota. A windfall will result if Western Dakota is allowed to keep Parker's percentage of renewal commissions. Parker was a valuable and productive employee of First American for almost a decade. She helped build a significant book of insurance business during her tenure there, and by contract is entitled to require Western Dakota to honor the Parker Agreement it expressly assumed when it purchased the assets of First American. As such, if this Court does not affirm the trial court on the contractual claim, it should reverse the trial court on the failure to rule on the merits of unjust enrichment and the conversion claims and based on the trial court's findings enter judgment in favor of Parker.

[¶ 33.] For the above reasons I would affirm the trial court's order requiring Western Dakota to pay Parker her share of renewal commissions, and therefore, respectfully dissent.